JIM JAY ENTERPRISES, INC.
t/a Thunder Rolls

v.

PENNSYLVANIA LIQUOR CONTROL
BOARD, Appellant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 14, 2013.

Decided April 30, 2014.

Reargument Denied June 17, 2014.

. Peter J. Yoon, Assistant Counsel, Harrisburg, for appellant.

Gregory T. Nichols, Greensburg, for appellee.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge McGINLEY.

The Pennsylvania Liquor Control Board (LCB) appeals the order of the Court of Common Pleas of Westmoreland County (trial court) that overruled the LCB's refusal to renew the restaurant liquor license of Jim Jay, Inc. (Jim Jay) and ordered that Jim Jay's license be renewed subject to certain conditions.

Jim Jay owned a restaurant liquor license for a bar known as "Thunder Rolls"

located at 312 Clay Avenue, Jeannette, Pennsylvania (Licensed Premises).[1] On March 27, 2012, Jim Jay applied to renew its license for the period beginning July 1, 2012, and ending on June 30, 2014. By letter dated June 15, 2012, the LCB's Bureau of Licensing (Bureau) notified Jim Jay that it objected to the renewal of its license pursuant to Section 470 of the Liquor Code (Code)[2], 47 P.S. § 4–470. The Bureau ordered that a hearing be held with respect to the renewal application. The Bureau of Licensing's objection was based on a violation of the Code relative to Citation Number 10–0347[3] and the improper conduct of the Licensed Premises as there were approximately fifteen incidents at or immediately adjacent to the Licensed Premises reported to the Jeannette City Police Department (Department) during the time period from July 2010, until the renewal request. The activity included but was not limited to a shooting, robbery, fights, assaults, a minor entering the bar, and disorderly operations.

A hearing was held on July 18, 2012, before the hearing examiner. The Bureau presented the renewal application, a copy of its objection letter dated June 15, 2012, and a copy of the adjudication issued with respect to the citation.

Officer James Joseph Phillips (Officer Phillips) of the Department testified that he was patrolling on August 18, 2011, at 12:57 a.m. when he observed two people arguing on the sidewalk in front of the Licensed Premises. Officer Phillips warned William Gavidia (Gavidia) and Jesse Loughner that they would be cited for disorderly conduct if the disturbance continued. They reentered the Licensed Premises. Approximately an hour later, Officer Phillips received a call about another disturbance at the Licensed Premises. He arrived and found Gavidia causing another disturbance that could be heard two blocks away. Notes of Testimony, July 18, 2012, (N.T.) at 8–9; Reproduced Record (R.R.) at 22a–23a. Gavidia was "screaming profanities and facing them towards the police." N.T. at 9; R.R. at 23a. Officer Phillips then observed Gavidia punch the front of a nearby storefront. Gavidia was taken into custody and charged with public drunkenness and disorderly conduct. N.T. at 9; R.R. at 23a. On cross-examination, Officer Phillips testified that the personnel at the Licensed Premises were never uncooperative with him during the course of any investigation. N.T. at 11; R.R. at 25a.

Officer Dennis Pape (Officer Pape) of the Department testified that on March 7, 2012, he was dispatched to the Licensed Premises based on a report of a fight. He observed a woman outside who said that she had been punched in the face by another patron, Melissa Maloy (Maloy), inside the Licensed Premises. When Maloy exited, she smelled like alcohol, staggered, and could not speak clearly. Maloy was charged with simple assault, criminal mischief, and public drunkenness. N.T. at 15–16; R.R. at 29a–30a. On cross-examination, Officer Pape acknowledged that Jim

---

1. When referring to the corporate entity, the name "Jim Jay" will be used. When referring to the bar, the name "Licensed Premises" will be used.

2. Act of April 12, 1951, P.L. 90, *as amended.*

3. Citation No. 10–0347 was issued on March 5, 2010, and concerned Jim Jay's violation of Section 471 of the Code, 47 P.S. § 4–471 and Section 5513 of the Crimes Code, 18 Pa.C.S. § 5513, in that Jim Jay by its servants, agents, or employees possessed or operated gambling devices or paraphernalia or permitted gambling or lotteries, poolselling and/or bookmaking on the licensed premises. Jim Jay admitted to the charge and was fined $600.00.

Jay and its employees were always cooperative with him. N.T. at 17; R.R. at 31a.

Corporal Shannon Binda (Corporal Binda) of the Department testified that on February 4, 2011, she was dispatched to the Licensed Premises after a report was received that an individual had just been assaulted and was outside the Licensed Premises on the sidewalk. Corporal Binda found Michael Taylor (Taylor) lying on the ground bleeding. Taylor was in the Licensed Premises and left to talk to a woman when he was hit in the side of the face. Taylor suffered a fractured left cheek, a concussion, and the possible loss of sight in his left eye. Corporal Binda did not know if the assailant had been inside the Licensed Premises. Corporal Binda said that the assault took place "three, four feet" from the entrance to the Licensed Premises. N.T. at 21–23; R.R. at 35a–37a. On cross-examination, Corporal Binda stated that she had always found Jim Jay employees cooperative. N.T. at 24; R.R. at 38a.

Officer Richard O'Neal (Officer O'Neal) of the Department testified that on January 30, 2011, he was dispatched to the Licensed Premises after a report of a fight. The fight ended by the time he arrived. While Officer O'Neal was speaking with the instigator of the fight, Tiffany Grogan (Grogan), she threatened a female. Grogan was cited for disorderly contact. N.T. at 28–29; R.R. at 42a–43a. Officer O'Neal stated that the Licensed Premises was not the worst bar with which the Department dealt but was a "[t]ypical bar." N.T. at 32–33; R.R. at 46a–47a. On May 3, 2011, Officer O'Neal was dispatched to the Licensed Premises due to a report of a fight. One of the participants was outside the Licensed Premises when he arrived and said that he was accosted inside. N.T. at 33–34; R.R. at 47a–48a.

On September 10, 2011, Officer O'Neal and another officer were dispatched to the Licensed Premises after a report of a fight involving a group of women. The police officers found a woman outside who was bleeding from her face after she was struck with a beer bottle. The investigation revealed that two women were playing pool when a third woman entered the bar and started fighting with one of the pool players. Officer O'Neal stated that two of them appeared to be intoxicated and would not comply with his request to stop screaming. They were both cited for public drunkenness and disorderly conduct. N.T. at 37–39; R.R. at 51a–53a.

Paul Jones (Jones), a patron of the Licensed Premises, testified that he was a participant in the fight on May 3, 2011, which prompted the call. Jones was sitting in the bar when a man and woman entered. Jones knew the woman. He had a prior non-violent incident with the man. The man started arguing with Jones and eventually the two started fighting. N.T. at 46–47; R.R. at 60a–61a.

Sergeant Jose A. Gonzales (Sgt. Gonzales) of the Department testified that on April 9, 2012, he was dispatched to the Licensed Premises in response to a reported shooting. The investigation revealed that a patron at the Licensed Premises, Thomas R. Milliron (Milliron), was shot three times in the parking lot during an attempted robbery by another patron. When Milliron left the bar, he was approached by two people. When one of them pulled a gun, Milliron attempted to run away but was shot three times: in his leg, back, and buttocks. N.T. at 54–58; R.R. at 68a–72a. Sgt. Gonzales testified that the Licensed Premises was one of the four bars out of twenty or twenty-five that he dealt with the most. N.T. at 67; R.R.

at 81a.[4]

Frank Henry Adar (Adar) testified that he shot pool on a regular basis at the Licensed Premises. On August 14, 2010, he was shooting pool with the bartender's son who did not pay off on a previous $10 bet, so the two started fighting. N.T. at 77; R.R. at 91a.

Sergeant Donald Joseph Johnston, Jr. (Sgt. Johnston) of the Department testified that he observed a disturbance on August 14, 2010, outside the Licensed Premises that involved several people pushing and shoving each other. When Sgt. Johnston approached, two males went back inside the Licensed Premises. When Sgt. Johnston entered, he saw a female patron crying and bleeding from the nose. The owner of the Licensed Premises stated that the victim had been arguing with Robert Myers (Myers) which led Myers to punch the victim. N.T. at 88; R.R. at 102a. On cross-examination, Sgt. Johnston testified that Jim Jay employees always cooperated with him with regard to incidents at the Licensed Premises. N.T. at 90–91; R.R. at 104a–105a.

On September 1, 2010, Sgt. Johnston saw a minor enter the Licensed Premises. Sgt. Johnston followed him in and arrested the minor and took him into custody for a curfew violation. N.T. at 92–93; R.R. at 106a–107a.

On February 6, 2011, Sgt. Johnston observed a crowd screaming and yelling just outside the Licensed Premises. One of the individuals yelling was Frank Kozinko (Kozinko) who was screaming obscenities. Sgt. Johnston followed him back into the Licensed Premises. Kozinko was intoxicated and would not comply with Sgt. Johnston's request to leave. He was arrested and in subsequent searches was found to possess cocaine and marijuana. N.T. at 97–100; R.R. at 111a–114a.

On September 1, 2011, Sgt. Johnston was dispatched to the Licensed Premises in response to a reported fight. Sara Chew, one of the participants in the fight, told Sgt. Johnson that she had been assaulted by Nicole Devosky, a former employee of Jim Jay, and was struck several times. N.T. at 102–103; R.R. at 116a–117a.

On March 14, 2012, Sgt. Johnston was dispatched to the Licensed Premises in response to a reported fight. The bartender told Sgt. Johnston that Amber Hall (Hall) punched a patron several times and bit the victim in the face outside the Licensed Premises. Sgt. Johnston observed abrasions on the victim's neck and a bite impression on her left cheek, and subsequently arrested Hall. N.T. at 106–108; R.R. at 120a–122a. On cross-examination, when asked whether there were an inordinate responses by the police to the Licensed Premises, Sgt. Johnson replied, "It's average." N.T. at 111; R.R. at 125a.

Anita Anderson (Anderson), the president, secretary, manager, director, and shareholder of Jim Jay, testified that she had owned Jim Jay for almost nine and one-half years. N.T. at 117; R.R. at 131a. Anderson and her daughter, Angela Smail (Smail), who was the treasurer and other shareholder, operated Jim Jay together. Anderson testified that she was away from the Licensed Premises quite a bit over the previous three years because she was taking care of her parents in Virginia. N.T. at 118; R.R. at 132a. She testified that if someone caused a problem in the Licensed Premises, "[they're] gone." N.T. at 121; R.R. at 135a. She also testified that Hall, who was involved in the March 14, 2012, incident, was barred from the Licensed

---

4. Milliron testified and essentially corroborated Sgt. Gonzales's testimony.

Premises for a long time. N.T. at 124; R.R. at 138a.

Smail testified that she would corroborate her mother's testimony if asked. N.T. at 132; R.R. at 146a. Smail was typically the only employee present except for a bartender on Friday and Saturday nights. N.T. at 134; R.R. at 148a.[5]

The hearing examiner recommended that the license be renewed subject to implementing security and utilizing a security wand at the Licensed Premises.

The LCB did not renew the license:

The record is replete with illegal activities that have either occurred at or immediately adjacent to the licensed premises. There is obviously a serious problem with Licensee's [Jim Jay] operations and the Board is very troubled by Licensee's [Jim Jay] failure to implement any substantial timely corrective measures to address its ongoing problems occurring at or immediately adjacent to the licensed premises, which has resulted in the Board's refusal of Licensee's [Jim Jay] renewal application.

The Board is concerned with Licensee's [Jim Jay] inability to appropriately address its security issues at the licensed premises. Although the April 9, 2012 shooting incident occurred off the licensed premises, the Board is concerned that the victim and assailant had frequented the licensed establishment prior to the incident. Also, it is troubling to the Board that Licensee [Jim Jay] failed to provide any evidence at the instant hearing with regard to any actions it may have taken to ensure the assailant is no longer permitted to frequent the licensed establishment, such as placing the individual on a barred patron list. The record shows the assailant followed the victim from the establishment and

subsequently approached the victim and attempted to rob the victim with a gun that the assailant pulled from his waistband. The Board is also disappointed that Licensee [Jim Jay] failed to provide any testimony regarding corrective measures it may have taken regarding the utilization of a metal detecting wand and/or pat downs to check its patrons for weapons to ensure the safety of its patrons.

Another security concern is Licensee's [Jim Jay] failure to provide details with regard to barring patrons. Although Licensee [Jim Jay] provided testimony at the hearing regarding a patron involved in the March 14, 2012 assault incident outside the licensed establishment who had allegedly been barred from its establishment, the Board is troubled by Licensee's [Jim Jay] lack of providing the pertinent details with regards to the barring of patrons. Given the numerous police incidents for assaults and fights at or immediately adjacent to the licensed premises, the Board would expect that Licensee [Jim Jay] would have a written barred patron list with all the individuals that are not permitted to frequent its establishment. Also, Licensee [Jim Jay] should ensure that all of its employees are aware of such a list and the list should be a living document that always reflects the most recent barred patron. As mentioned above, Licensee's [Jim Jay] failure to provide such pertinent corrective measures only serves to reinforce the Board's decision to refuse its license renewal.

Another example of Licensee's [Jim Jay] failure to seriously address its security problems is its failure to have the appropriate security on the licensed premises during its hours of operation. Although

---

**5.** Carrie Kaufman, a patron, testified in support of Jim Jay.

Licensee [Jim Jay] testified that it does not need security because its patrons are nice people and they feel safe inside its establishment, the Board [LCB] finds the evidence provides a different story, and finds that Licensee [Jim Jay] not providing appropriate security personnel for its licensed premises to be unacceptable, especially given Licensee's [Jim Jay] numerous serious incidents at or immediately adjacent to the licensed premises.

Another security concern is Licensee's [Jim Jay] failure to provide details with regard to any exterior surveillance cameras it may have installed and whether it has the appropriate lighting on the exterior of its licensed premises. Although the record shows that Licensee [Jim Jay] has interior surveillance cameras and the police department has utilized this footage during its investigation of some of the incidents, the record is unfortunately absent of any testimony regarding cameras and the appropriate lighting on the exterior of the licensed premises. Given the numerous serious incidents occurring outside the licensed establishment, the Board would be troubled if Licensee [Jim Jay] had not installed the appropriate lighting and security cameras on the exterior of its licensed premises, which appears to be the situation in the instant matter.

The Board is also concerned with what appears may be a drug problem at the licensed premises. The record shows that the police observed a drug transaction taking place inside the licensed establishment from Licensee's [Jim Jay] surveillance footage provided to the police during the police's investigation of the April 9, 2012 shooting incident and during the February 6, 2011 incident the police recovered two (2) baggies of marijuana and one (1) baggie of cocaine from a patron of Licensee [Jim Jay]. Licen-

see's [Jim Jay] failure to provide any timely corrective measures at the instant hearing, such as pat downs and posting signage on the licensed premises, to address what appears to be a drug problem on its premises, is very troubling to the Board [LCB] and also reinforces the Board's [LCB] refusal of Licensee's [Jim Jay] renewal application.

Another area of concern for the Board is what appears may be a problem with minors frequenting the licensed establishment. The record shows during the September 1, 2010 police incident, a police officer observed a seventeen (17)-year-old minor enter the licensed establishment and the officer did not see Licensee [Jim Jay] taking any action to prevent the minor from entering the licensed establishment. The Board [LCB] finds this to be very problematic and is disappointed that Licensee [Jim Jay] failed to provide any corrective measures it may have taken, such as utilizing a transaction identification scanner, to ensure that minors are not frequenting the establishment.

Licensee's [Jim Jay] failure to take timely corrective measures to address its problems at its licensed premises appears to be a pattern for Licensee [Jim Jay], and is something that the Board [LCB] cannot allow to continue. Licensee's [Jim Jay] overall operation of its business is also troubling to the Board [LCB]. The record shows that Licensee [Jim Jay] received a citation in 2010 for unlawful gambling but no testimony was provided at the instant hearing on any corrective measures that Licensee [Jim Jay] has taken to address this citation. Also, at the hearing, testimony was provided that showed an assault occurred inside the licensed establishment on August 14, 2010, and it appears the catalyst for this assault was a pool game wager

between the victim and assailant, Ms. Graham's [Smail] son. Although Ms. Anderson testified there is signage posted next to the pool table that specifically prohibits such wagers on pool games, it appears from the assault incident that this measure is not sufficient to deter such actions. The Board is disappointed that Licensee [Jim Jay] has not taken the initiative to implement additional measures to ensure that unlawful gambling is not occurring on its premises, such as employing security personnel. Another area of concern with Licensee's [Jim Jay] operation is its management. The record shows Licensee's [Jim Jay] Board-approved manager, Ms. Anderson, appears to have not been fulfilling her responsibilities as a Board manager during the three and one-half (3½) years prior to the instant hearing, because Ms. Anderson testified that she goes to help take care of her parents 'every six weeks to two months' in Virginia. It appears from the record that during the time that Ms. Anderson is taking care of her parents, Ms. Graham [Smail] has been making the day-to-day decisions at the licensed premises. As section 5.23(a) of the Board's Regulations iterates, it is imperative that a licensee's Board-approved manager devote his/her full time and attention to the licensed business. . . . However, in the instant matter is [sic] appears that Licensee [Jim Jay] has not been adhering to this regulatory requirement. Also, if it was Licensee's [Jim Jay] intention to have Ms. Graham [Smail] be its Board-approved manager, it should have completed the requisite application with the Board [LCB] pursuant to section 5.23 of the Board's [LCB] regulations . . . which appears that Licensee [Jim Jay] has also failed to do.

The Board believes the evidence is clear that Licensee [Jim Jay] has not under-taken the appropriate substantial corrective measures to address the problems and issues at its licensed premises in a timely manner. Considering the discretion given to the Board by the Legislature in section 470 of the Liquor Code, the citation and numerous police incidents provide more than enough reason to not renew this license, and the Board chose to use its discretion to refuse Licensee's [Jim Jay] renewal application for the period beginning July 1, 2012. (Citations omitted).

LCB Opinion at 39–45.

Jim Jay appealed to the trial court. The trial court heard the matter on November 16, 2012. The parties agreed to submit the entire record from the LCB proceeding.

Smail testified regarding the lighting outside the Licensed Premises. Notes of Testimony, November 16, 2012, (N.T. 11/16/12) at 15–17; R.R. at 248a–250a. Smail testified that there were eight security cameras in the establishment and the cameras could be observed at her residence and her mother's residence. N.T., 11/16/12 at 18; R.R. at 251a. Smail testified that she kept a bar log of barred patrons underneath the cash register in a cabinet. She stated that the log had been kept for seven or eight years. N.T. 11/16/12 at 21–22; R.R. at 254a–255a. She also testified that a list of rules, including a "no betting" sign, was posted near the pool table. N.T. 11/16/12 at 25–26; R.R. at 258a–259a. Smail stated that the customers were "like a family" but if someone enters, whom she perceives to be a threat, she will ask them to leave. N.T. 11/16/12 at 28–29; R.R. at 261a–262a. Although no one is patted down or "wanded", Smail's husband provides security. If she believes there will be drug activity, she asks the possible perpetrators to leave. N.T.

11/16/12 at 29–30; R.R. at 262a–263a. Smail never serves minors. In the one incident that Sgt. Johnston described at the hearing before the hearing examiner, a seventeen year old ran into the Licensed Premises into the restroom and was there less than a minute when he was apprehended for a curfew violation. N.T. 11/16/12 at 35–36; R.R. at 268a–269a. She explained that a few of the other incidents that were discussed at the earlier hearing did not have a direct connection to the operation of the licensed premises.[6]

The trial court ordered the LCB to renew the license provided that Jim Jay employ a bouncer/security person each night the Licensed Premises was open from 9:00 p.m. until closing, that Jim Jay purchase and utilize a wand device on all patrons entering the Licensed Premises to see if a patron is carrying a weapon, that Jim Jay purchase security cameras for the exterior of the premises, that if Anderson intended to abdicate her duties as manager, then she must complete the requisite application with the LCB to have another appointed, and that Jim Jay prepare a detailed list of patrons who were barred from the premises, containing information on the name of the patron barred, the length of time the person was barred, the date of the incident and details of the incident that resulted in that person being barred, and the name of the employee who barred the patron.

The trial court reasoned:

The case of *U.S.A. Deli, Inc. v. Pennsylvania Liquor Control Board*, 909 A.2d 24 (Pa.Cmwlth.2006) makes it clear that there is unfettered discretion in the Board to renew a license based upon what ever [sic] reasoning it believes should allow renewal. Thus, if the Board has such unfettered discretion so

does the trial court. It is only when such discretion is abused that the decision of the court to renew may be reversed. Therefore, I find that I have the discretion to grant renewal with specific conditions placed upon such renewal to assure that the Licensee [Jim Jay] will operate the establishment in accordance with the liquor laws and to assure that there be no relationship between activity occurring outside the premises and the manner in which the premises is operated.

Although there are a number of incidents that have occurred outside and inside the premises that have required police intervention, on most occasions the intervention was sought by the Licensee [Jim Jay]. Furthermore, many of the incidents did not have a relationship to the manner in which the licensed premises is operated. Certainly the evidence shows that improvements can be made in the security and monitoring of patrons at the establishment to allow for more rapid intervention and perhaps even prevention. This is something that I will order be accomplished as part of the conditional renewal of the license that I will Order. I believe a conditional renewal that requires tighter security and monitoring of both the inside and outside of the licensed building will serve the interests of justice and at the same time protect the public welfare and promote the peace and morals of the Citizens of this Commonwealth.

Trial Court Opinion, January 9, 2013, (Opinion) at 21–22.

■ The LCB contends that the trial court erred when it held that it had the authority to renew the liquor license regardless of whether Jim Jay took any timely or substantial measures to operate

---

**6.** Anderson also testified regarding the operations of Jim Jay.

the Licensed Premises in compliance with the Code.[7]

 Under the Code, the renewal of a liquor license is not automatic. Section 470(a.1) of the Code, 47 P.S. § 4–470(a.1), provides that the LCB may refuse to renew a liquor license for several reasons.[8] The LCB may consider the licensee's record of violations when it decides whether to renew a liquor license and even a single violation may be sufficient to decline to renew a license. *Hyland Enterprises, Inc. v. Pennsylvania Liquor Control Board*, 158 Pa.Cmwlth. 283, 631 A.2d 789 (1993). The LCB may examine a pattern of violations for which penalties have already been paid in deciding whether to renew a license. *Atiyeh v. Pennsylvania Liquor Control Board*, 157 Pa.Cmwlth. 28, 629 A.2d 182 (1993), *petition for allowance of appeal denied*, 536 Pa. 649, 639 A.2d 35 (1994). This Court has determined that "regardless of when they occur the Board [LCB] may consider all code violations committed by a licensee in determining whether to renew a liquor license." *Bartosh*, 730 A.2d at 1033.

 When a party appeals an LCB decision, the trial court hears the appeal *de novo* pursuant to Section 464 of the Code, 47 P.S. § 4–464,[9] and makes its own findings of fact and conclusions of law. The trial court must receive the record of the proceedings before the Board, if it is offered, and is permitted to take new evidence. Even if the trial court does not make findings of fact that are materially different from those found by the LCB, it may reach a different conclusion. Two

---

7. This Court's review is limited to a determination of whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion or committed an error of law. *Pennsylvania Liquor Control Board v. Bartosh*, 730 A.2d 1029 (Pa.Cmwlth.1999).

8. This Section was added by the Act of June 18, 1998, P.L. 664. Section 470(a.1) of the Code, 47 P.S. § 4–470(a.1), provides:

The Director of the Bureau of Licensing may object to and the board may refuse a properly filed license application:
(1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have violated any of the laws of this Commonwealth or any of the regulations of the board;
(2) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have one or more adjudicated citations under this or any other license issued by the board or were involved in a license whose removal was objected to by the Bureau of Licensing under this section;
(3) if the licensed premises no longer meets the requirements of this act or the board's regulations; or
(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any *substantial steps* were taken to address the activity occurring on or about the premises. (Emphasis added).

9. Section 464 provides in pertinent part:

The court shall hear the application de novo on questions of fact, administrative discretion and such other matters as are involved, at such time as it shall fix, of which notice shall be given to the board. The court shall either sustain or over-rule the action of the board and either order or deny the issuance of a new license or the renewal or transfer of the license or the renewal or an amusement permit to the applicant.

*Sophia's Inc. v. Pennsylvania Liquor Control Board,* 799 A.2d 917 (Pa.Cmwlth.2002). As the trier of fact in a *de novo* hearing, the trial court is permitted to sustain, alter, change, modify or amend a decision by the LCB. *Todd's By the Bridge, Inc. v. Pennsylvania Liquor Control Board,* 74 A.3d 287 (Pa.Cmwlth.2013).

■ When there are violations of the law unrelated to the Code, the LCB may refuse to renew a license where a licensee "(1) knows or should have known of ongoing criminal activities; and (2) ... failed to take substantial affirmative steps to prevent such activities." *Rosing, Inc. v. Pennsylvania Liquor Control Board,* 690 A.2d 758, 761 (Pa.Cmwlth.1997). Under this standard, both parts must be satisfied for a third-party crime to form the basis for the refusal to renew a license. *Id.*

■ In determining whether to renew a license on appeal, the trial court is permitted to consider substantial steps taken by a licensee to remediate the violations. *U.S.A. Deli, Inc. v. Pennsylvania Liquor Control Board,* 909 A.2d 24 (Pa.Cmwlth. 2006), *petition for allowance of appeal denied,* 593 Pa. 736, 929 A.2d 647 (2007). Remedial measures must be taken at a time when the licensed establishment knew or should have known that illicit activity was occurring on the premises. *I.B.P.O.E. Lodge 151 v. Pennsylvania Liquor Control Board,* 969 A.2d 642 (Pa. Cmwlth.2009).

The LCB asserts that Jim Jay was aware of a pattern of violent conduct on and about the Licensed Premises for at least a two year period and failed to take substantial steps to address the pattern. The LCB argues that the trial court's decision to renew the license even though Jim Jay failed to take substantial steps consti-

tutes an error of law and an abuse of discretion.

In its opinion the LCB set forth one prior adjudicated citation and fourteen incidents to which the members of the Department testified. The LCB determined that there was a serious problem with Jim Jay's operations and also determined that Jim Jay failed to implement any substantial timely corrective measures to address the ongoing problems occurring at or immediately adjacent to the Licensed Premises. The LCB in its decision identified specific concerns with the failure to establish a barred patrons list for patrons involved in illegal activity, the failure to use a metal detecting wand and/or pat downs to check the patrons for weapons, the lack of pertinent details regarding the barred patrons list, the failure to have appropriate security personnel, the failure to provide details regarding exterior surveillance and exterior lighting, a potential drug problem at the Licensed Premises, a problem with minors frequenting the Licensed Premises [10], the failure to correct problems with illegal gambling, and Anderson's failure to meet her responsibilities as a manager.

In its review of the record, the trial court addressed each incident. With respect to the incident where Adar got into a fight while playing pool, the trial court noted that there were clearly posted rules that prohibited betting on games of pool and that there was a policy that a violation of the rules would result in a patron being barred from the Licensed Premises for thirty days. Opinion at 278.

Regarding the incident where the seventeen year old male entered the Licensed Premises after he realized that a police officer saw him on the street after curfew, the trial court determined that Jim Jay

---

**10.** The record only reflects one instance where a minor entered the Licensed Premises and that was to avoid a police officer because the minor was on the street after curfew.

personnel had no opportunity to prevent the minor from entering the Licensed Premises. Opinion at 278–79. The trial court made this determination based on Smail's testimony. The LCB's finding that Jim Jay had a problem with minors "frequenting" the Licensed Premises is unsupported by substantial evidence.

With regard to the February 4, 2011, incident where Taylor was assaulted, the trial court found that there was no causal connection between the assault and the manner of operation of the Licensed Premises. Opinion at 279–80. With respect to the drug arrest of Kozinko at the Licensed Premises, the trial court found that there was no evidence that the criminal act was connected in any way to the manner in which Jim Jay was operated. Opinion at 280–81. Similarly, the trial court found that the incident on May 3, 2011, where Jones was assaulted was unrelated to Jim Jay because Jones had a prior incident with his assailant. Opinion at 280–81.

With respect to the September 10, 2011, incident, the trial court found that a woman entered the Licensed Premises and went directly to a patron and started a fight. Jim Jay had previously barred the assailant from the Licensed Premises, but she entered anyway. The trial court found that Jim Jay's preventive measures were ineffective. Opinion at 282–83. The trial court recounted the other incidents but declined to comment on the relationship of Jim Jay to those incidents.

Based on evidence of just two drug "incidents" over a ten year period, the trial court found that there was not sufficient evidence to establish that a "drug problem" existed at the Licensed Premises. Similarly, the trial court found that the evidence did not support a finding that minors frequented the Licensed Premises. With regard to gambling on August 14,

2010, the trial court found that the actual bet that resulted in the argument/fight had taken place before August 14, 2010. Further, Jim Jay had posted rules against gambling.

While the trial court discounted drug activity, the incident with the minor, and gambling, the trial court stated:

> There seems to be no question that the Licensee [Jim Jay] was aware of a pattern of violent conduct in and about the licensed premises for at least a two year period. Her [sic] knowledge of such activity cannot be questioned because on many of the occasions of violent conduct she or her employees were the persons that notified the police.

Trial Court Opinion at 21.

It is not in dispute that Jim Jay knew or should have known of the ongoing criminal activities. In fact the trial court found that often personnel of Jim Jay alerted the Department to the activity. The next step of the analysis under *Rosing* is to determine whether Jim Jay undertook substantial steps to attempt to remedy the situation. The LCB determined in its decision that Jim Jay failed to take "appropriate substantial corrective measures to address the problems and issues at its licensed premises in a timely manner." LCB Opinion at 44–45. The trial court conceded in its opinion that improvements could be made in the security and monitoring of patrons. The trial court did not find that Jim Jay had undertaken measures to correct the activities.

The trial court asserted in its opinion that it had the unfettered discretion to renew a license based upon whatever reasoning it believed should allow renewal pursuant to *U.S.A. Deli.* This Court does not agree with the trial court's analysis of *U.S.A. Deli.* In *U.S.A. Deli,* this Court held that the Court of Common Pleas of

Philadelphia County (common pleas court) had the discretion to consider whether a licensee undertook substantial steps to address violations of the Code. Although Section 470(a.1) of the Code, 47 P.S. § 4–470(a.1), states that the LCB may take into consideration whether any substantial steps were taken to address activity occurring on or about a licensee's premises, this Court held that the common pleas court may appropriately consider whether a licensee took substantial steps to address Code violations in addition to third party activity and renew a license because the LCB had the discretion to do so. *U.S.A. Deli* did not hold that the trial court has the discretion to ignore the Code and relevant case law. Because Jim Jay did not take substantial steps to address the problems in accordance with *Rosing,* the trial court erred when it ordered the renewal of the license subject to conditions.

In sum, the record establishes that Jim Jay was aware of ongoing criminal activity on or adjacent to the Licensed Premises. While the record supports the trial court's determinations that the evidence did not support findings that minors frequented the bar, that there was a pattern of drug activity, or a problem with gambling on the Licensed Premises, the trial court still found that there was a pattern of other criminal activity of which Jim Jay was aware and did not take substantial steps to address. The General Assembly has determined that the LCB possesses the authority to consider whether a licensee has taken any substantial steps to address criminal activity of which it was aware and which bore a relationship to the operation of licensed premises. Further, case law has refined this determination such that if a licensee is aware of criminal activity by an employee or patron, the licensee's license will not be renewed if the licensee failed to take substantial steps to attempt to prevent the misconduct. *Rosing.* The trial court found that Jim Jay failed to take substantial steps. As a result, the trial court erred when it ignored this well-established rule and ordered the renewal of the license subject to certain conditions.

Accordingly, this Court reverses.

## *ORDER*

AND NOW, this 30th day of April, 2014, the order of the Court of Common Pleas of Westmoreland County in the above-captioned matter is reversed.

DISSENTING OPINION BY Judge COHN JUBELIRER.

I respectfully dissent. Because the trial court misapprehended the legal standard for the renewal of a liquor license, it did not have an opportunity to determine whether Licensee's license should be renewed without conditions or denied. Therefore, I would vacate the trial court's decision and remand this matter to the trial court to exercise the discretion granted to it by Section 464 of the Liquor Code.[1]

The trial court did not renew Licensee's license on the basis of substantial steps taken by Licensee to remedy illegal activity occurring on or near Licensee's establishment. Instead, the trial court decided this case on the rationale that it could impose conditions on the renewal of Licensee's license, stating, "I find that I have the discretion to grant renewal with specific conditions placed upon such renewal to assure that the Licensee will operate the establishment in accordance with the liquor laws . . . ." and:

---

1. Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. § 4–464.

Certainly the evidence shows that improvements can be made in the security and monitoring of patrons at the establishment to allow for more rapid intervention and perhaps even prevention. This is something that I will order be accomplished as a part of the conditional renewal of the license that I will Order. I believe a conditional renewal that requires tighter security and monitoring of both the inside and outside of the licensed building will serve the interests of justice and at the same time protect the public welfare and promote the peace and morals of the Citizens of the Commonwealth.

(Trial Ct. Op. at 22.) The trial court, however, does not have the discretion to impose conditions on the renewal of a license. *Becker's Café, Inc. v. Pennsylvania Liquor Control Board,* 67 A.3d 885, 893–94 (Pa.Cmwlth.2013). "Section 464 only authorizes a trial court to 'either sustain or over-rule the action of the board and either order or deny the issuance of a new license or the renewal or transfer of the license ... to the applicant.'" *Becker's Café,* 67 A.3d at 894 (quoting 47 P.S. § 4–464) (omission in original). Because the trial court erroneously decided the case on the rationale that it could mitigate any pattern of violent conduct with conditions, it did not consider whether, in its discretion, the pattern of violent conduct warranted renewal of the license without conditions or denial of renewal.

The Majority would hold that, because the trial court found a pattern of violent conduct existed in and around Licensee's premises and Licensee knew of the pattern, renewal of Licensee's license must be denied. However, the Board and the trial court have the discretion to renew a license *despite* a pattern of illegal conduct. Section 470(a.1) of the Liquor Code, 47 P.S. § 4–470(a.1),[2] provides that the Board

*may* refuse a license application due to a pattern of illegal conduct, not that it *must* do so if such a pattern is found. Importantly, the trial court found that some of the incidents which compose this pattern of illegal conduct were not caused by the manner of Licensee's operation. "[M]any of the incidents did not have a relationship to the manner in which the licensed premises is operated." (Trial Ct. Op. at 22.) Illegal activity that occurs near a licensed premises only forms the basis for non-renewal of a license "if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated." 47 P.S. § 4–470(a.1)(4). Thus, it is unclear from the trial court's opinion which incidents it would find are properly attributable to the manner of Licensee's operation. Therefore, I believe we must remand this matter to the trial court to determine whether, in its discretion, incidents of illegal activity attributable to the manner of Licensee's operation of the licensed premises justify non-renewal of Licensee's license, or renewal without conditions.

---

**2.** Added by the Act of December 21, 1998, P.L. 1202.