BECKER'S CAFÉ, INC., Appellant

v.

PENNSYLVANIA LIQUOR
CONTROL BOARD.

Becker's Café, Inc.

v.

Pennsylvania Liquor Control
Board, Appellant.

Commonwealth Court of Pennsylvania.

Argued April 16, 2013.
Decided June 7, 2013.

Michael J. Plank, Assistant Counsel, Harrisburg, for designated appellant Pennsylvania Liquor Control Board.

Samuel J. Pasquarelli, Pittsburgh, for appellee.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and COLINS, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

In these consolidated appeals, the Pennsylvania Liquor Control Board (Board) and Becker's Café, Inc. (Licensee) appeal from an Order of the Court of Common Pleas of Allegheny County (trial court) reversing a decision of the Board and renewing Licensee's restaurant liquor license subject to the condition that it cease serving alcohol by 10:30 p.m. and close by 11:00 p.m. every night. On appeal, the Board argues that the trial court erred and/or abused its discretion by finding that: (1) Licensee was not responsible for the numerous incidents of violence and drug activity on or about the licensed premises; and (2) the remedial steps taken by Licensee were timely and substantial. Both the Board and Licensee argue that the trial court erred and/or abused its discretion by finding that Licensee's license should be conditionally renewed by restricting the hours of operation.

Licensee is located in McKees Rocks, Allegheny County, Pennsylvania, in a high crime area known as the "Bottoms." (Trial Ct. Op. at 4, 15.) Licensee applied, two days late, for a renewal of its restaurant liquor license for the renewal period of June 1, 2011 to May 31, 2013. Upon review of the renewal application (Application), the Board's Bureau of Licensing advised Licensee that it objected to the renewal based on: (1) five adjudicated violations of the Liquor Code[1] between September 17, 1991 and March 20, 2009; (2) eighteen incidents of disturbance at, or immediately adjacent to, the licensed premises; and (3) the late filing of the

1. Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1–101–10–1001.

Application. (Board Decision at 2–5.) A hearing on the Application was held on July 26, 2011, at which several police officers testified as to twelve incidents of disturbances that occurred in or around the licensed premises during 2010. These incidents involved:

(1) the January 18, 2010 shooting outside Licensee's premises at approximately 10:51 p.m. (Board Decision, Findings of Fact (FOF) ¶¶ 11–16);

(2) the March 9, 2010 walk through of the licensed premises where the police observed a patron, in the bathroom, with a small plastic bag of marijuana (FOF ¶¶ 28–30);

(3) the March 12, 2010 arrest of a female patron for the assault, inside the licensed premises, of another female patron (FOF ¶¶ 55–57);

(4) the March 28, 2010 arrest for public drunkenness outside the licensed premises of an intoxicated male, who was known to police for past drug related offenses, and who had on his person marijuana, crack cocaine and $49.00 in U.S. Currency (FOF ¶¶ 46–50);

(5) the May 13, 2010 observation by the police of a confidential informant's meeting outside the licensed premises with a known drug dealer, who exited the licensed premises, to give the informant crack cocaine (FOF ¶¶ 59–63);

(6) the May 29, 2010 search of the licensed premises for an individual not found on the premises but later arrested in another location for, *inter alia,* simple assault committed inside the licensed premises (FOF ¶¶ 21–24);

(7) the June 1, 2010 fight at 12:15 a.m. between several females near the licensed premises (FOF ¶¶ 69–70);

(8) the June 23, 2010 assault, inside the licensed premises, of one female patron by another female patron (FOF ¶¶ 71–73);

(9) the July 16, 2010 arrest of an individual exiting the licensed premises for possession of crack cocaine, that the individual stated he purchased from a patron inside the licensed premises (FOF ¶¶ 17–20);

(10) the July 24, 2010 assault of a female outside the licensed premises after an argument began inside the premises (FOF ¶¶ 63–65);

(11) the November 5, 2010 arrest of a patron outside the licensed premises for public drunkenness, upon whose person the police found crack cocaine that the patron stated he purchased from an individual inside the licensed premises (FOF ¶¶ 32–35); and

(12) the November 5, 2010 observation of known narcotics users outside the licensed premises that resulted in a search of the premises at 11:00 p.m. that evening, where the police discovered marijuana, crack cocaine and $936 in U.S. Currency on a patron's person and recovered an illegal firearm from another patron (FOF ¶¶ 37–44).

Licensee's owner, Conrad Becker, who has been involved with the establishment for forty years, testified that the problems at his establishment, which began in the last few years, were due to certain people moving into the area. (FOF ¶¶ 74–76.) Mr. Becker also testified with respect to the remedial measures he has taken to address the problems in the area and in his establishment, "such as hiring a security agency, removing patrons for swearing, taking out the bathroom stalls, removing the pay-phone, and prohibiting patrons under the age of twenty-five (25)." (FOF ¶ 77.)

The hearing examiner recommended that Licensee's Application be approved with the condition that Licensee cease serving alcohol by 10:30 p.m. and that the

premises be closed no later than 11:00 p.m. on a daily basis. (Hearing Examiner's Recommended Opinion, R.R. at 297a–307a.) Upon review, the Board refused Licensee's Application. (Board Decision at 2.) The Board opined that it would not be inclined to deny the renewal of Licensee's license based only on the citations for violations of the Liquor Code; however, "[t] he citation history combined with the numerous incidents at or immediately adjacent to the licensed premises and the late filed renewal application [provided] ample reason for denying renewal of Licensee's restaurant liquor license." (Board Decision at 21.) The Board determined that the area surrounding the licensed premises was rife with drugs and crime, and that the numerous incidents within one year were disturbing. The Board determined that the foregoing, along with "the dearth of remedial measures taken by Licensee," convinced it that Licensee's establishment contributed to the problems in the area. (Board Decision at 25–26.) The Board also stated that Licensee offered no explanation for filing the Application late and that the delay in filing, in addition to the citation history and numerous incidents of disturbance, convinced it that "Licensee ha[d] abused its licensing privilege." (Board Decision at 26.) Licensee appealed the Board's refusal to renew its license to the trial court.

A *de novo* hearing was held before the trial court on February 17, 2012, at which the Board moved the administrative record into evidence. (Trial Ct. Op. at 2.) Mr. Becker and two employees presented additional testimony before the trial court. (Trial Ct. Op. at 2.) The trial court adopted the majority of the Board's and hearing examiner's findings of fact; however, the trial court came to a different conclusion than the Board and found that the incidents were neither the result of, nor related to, the manner in which the establish-

ment was operated and that Licensee had taken substantial steps to remedy and address the activity occurring on or about the premises.

The trial court found that Mr. Becker, at the request of the Allegheny County District Attorney's Office's Nuisance Bar and Drug Task Force, met with representatives of the District Attorney's Office and the Board, the Mayor of McKees Rocks, and the McKees Rocks' Chief of Police in January 2010. (Trial Ct. Op. at 5.) Several recommendations were proposed to Mr. Becker during this meeting to address the problems surrounding his establishment. (Trial Ct. Op. at 5.) The recommendations included: (1) upgrading his security cameras; (2) hiring security guards; (3) removing the bathroom stalls; and (4) carding all patrons. (Trial Ct. Op. at 5.) Mr. Becker immediately implemented the recommendations and made additional changes that included only permitting one person at a time to use the bathrooms; removing the pay telephone; not serving any patron under the age of twenty-five; banning certain patrons from the premises; ejecting unruly patrons; and eliminating hardcore hip hop, rap, and profane music from the jukebox, including music that referenced cop killing or guns. (Trial Ct. Op. at 6–7.)

The trial court also reviewed the incidents testified to by the police, six of which involved violence and six of which were drug related, to determine each incident's relationship and/or connection to the manner in which Licensee operated. (Trial Ct. Op. at 8.) Based on its review, the trial court found that "the record does not support a finding that the manner in which [Licensee] was operated contributed to and/or caused" the serious incidents of violence. (Trial Ct. Op. at 11.) Rather, four of the six incidents of serious violence "were caused by prior incidents and/or bad

blood between the parties involved." (Trial Ct. Op. at 11.) With respect to the remaining issues, the trial court found as follows:

The Bottoms of McKees Rocks is an area well-known for crime and drugs. The officers believe this was related to the presence of three housing projects within a 1.2 square mile area in which [Licensee] was located. [Mr.] Becker and his employees attributed the dramatic rise in drugs and violence to the occupants from the housing projects and, in particular, the building across the street where fourteen people resided in a two bedroom unit. Eventually, the occupants were evicted and there have not been any problems in about a year and a half. For the most part, the drug users and dealers were well-known to the officers prior to the incidents at issue, but remained on the streets. [Mr.] Becker testified he reported two drug transactions, but the officers failed to appear in court and the charges were dismissed.

The changes and improvements made by [L]icensee ..., occurred prior to the administrative hearing and I find them to be timely. [Mr.] Becker attempted to avert problems and work with the Mayor, Chief of Police and the District Attorney's Nuisance Bar and Drug Task Forces. The bar has been recommended as a place for good food and a family atmosphere. Despite the considerable changes implemented by [L]icensee, the incidents at issue occurred and there was substantial evidence they resulted from a bad element residing within the housing projects.

.    .    .    .    .

An analysis of the incidents of violence reveals they were not alcohol related. Neither the testimony of the officers nor the police reports, relating to these incidents provided evidence that the actors were intoxicated. In fact, the primary cause was a prior history of bad blood between the parties. While the shooting was a serious matter, there was no indication it was in any way connected to the bar.

There is no doubt that several individuals were arrested in the immediate vicinity of the bar in possession of small amounts of illegal drugs, seemingly for personal use. But the search of bar patrons [on] November 5, 2010, yielded only one person possessing illegal drugs, albeit clearly in an amount to warrant the charge of possession with intent to deliver. Absent from the record was evidence [that Licensee] condoned or fostered drug sales. The evidence was that [Mr. Becker], himself, called the police when he observed drug transactions.

I find the incidents were neither the result of nor related to the manner in which [L]icensee operated the bar, within the meaning of [Section] 470(a.1)(4) of the Liquor Code.[2] Nor was there any testimony connecting them to alcohol. [Mr.] Becker implemented all changes recommended to him, despite the heavy financial burden.

(Trial Ct. Op. at 15–18 (citations to record omitted).)

■    Finally, the trial court found that it had the authority, pursuant to Section 464 of the Liquor Code[3] to do more than

---

2.  47 P.S. § 4–470(a.1)(4).

3.  47 P.S. § 4–464. Section 464 provides, in relevant part, that:

Any applicant who has appeared at any hearing ... who is aggrieved by the refusal of the board ... to renew ... any such license ... may appeal ... to the court of

merely reverse the Board's refusal to renew Licensee's license; therefore, because eight of the incidents occurred after 10:30 p.m., the trial court conditioned the renewal of the license on restricted hours of operation as recommended by the hearing examiner. The trial court shared "the hearing examiner's opinion that ceasing alcohol sales at 10:30 p.m. could prevent most of the activity giving rise to the incidents at issue." (Trial Ct. Op. at 19 (footnote omitted).) Accordingly, the trial court entered an Order reversing the Board's Decision and renewing Licensee's license subject to the condition that it shall cease serving alcohol by 10:30 p.m. and close by 11:00 p.m. every night. (Trial Ct. Order.) These appeals followed.[4]

"Under the Liquor Code, renewal of a liquor license is not automatic." *St. Nicholas Greek Catholic Russian Aid Society v. Pennsylvania Liquor Control Board,* 41 A.3d 953, 957 (Pa.Cmwlth.2012). Section 470(a.1) of the Liquor Code provides, in pertinent part, that the Board may refuse to renew a license:

> (2) if the licensee, . . . [has] one or more adjudicated citations under this or any other license issued by the board or [was] involved in a license whose renewal was objected to by the Bureau of Licensing under this section; [or] . . .
>
> . . .
>
> ▮▮▮ (4) due to the manner in which this or another licensed premises was operated while the licensee, . . . [was] involved with that license. When considering the manner in which this or

another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4–470(a.1)(2), (4). "Licensees are held strictly liable for violations of the Liquor Code that occur on the licensed premises." *St. Nicholas,* 41 A.3d at 958. "Licensees are also held accountable for activity occurring off-premises where there is a causal connection between the licensed premises and the activity." *Id.* (citing *Commonwealth v. Graver,* 461 Pa. 131, 135, 334 A.2d 667, 669 (1975)). A licensee may be held "accountable for non-Liquor Code violations (like those under the Crimes Code), if it can be established that there was a pattern of illegal activity on the licensed premises about which the licensee knew or should have known, and the licensee failed to take substantial steps to prevent such activity." *Philly International Bar, Inc. v. Pennsylvania Liquor Control Board,* 973 A.2d 1, 3 (Pa.Cmwlth. 2009) (citing *Pennsylvania Liquor Control Board v. TLK, Inc.,* 518 Pa. 500, 502, 544 A.2d·931, 932 (1988)).

Here, the Board first argues that the trial court erred by finding that Licensee

---

common pleas. . . . The court shall hear the application de novo. . . . The court shall either sustain or over-rule the action of the board and either order or deny . . . the renewal . . . of the license. . . .
*Id.*

4. "Our review in a liquor license renewal case is limited to a determination of whether

the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law." *St. Nicholas Greek Catholic Russian Aid Society v. Pennsylvania Liquor Control Board,* 41 A.3d 953, 954 n. 1 (Pa.Cmwlth. 2012).

was not responsible for the numerous incidents of violence and drug activity on or about the licensed premises. In finding that the incidents in question were neither the result of nor related to the manner in which Licensee operated its establishment within the meaning of Section 470(a.1)(4) of the Liquor Code, the Board asserts that the trial court was requiring some level of personal involvement by Licensee and/or its employees before holding Licensee accountable for that activity. The Board contends that this is simply the wrong standard of culpability and that the trial court should have evaluated the pattern of activity in accordance with this Court's recent decision in *St. Nicholas.* The Board asserts that, this Court, in affirming the trial court's affirmance of the Board's denial of the renewal of a licensee's liquor license in *St. Nicholas,* rejected arguments made by that licensee that are substantially similar to the arguments made by Licensee here as to why there was no causal connection between the alleged incidents of disturbance occurring near the licensed premises and the manner in which it operated its business. The Board argues that, as in *St. Nicholas,* "[i]t is simply not plausible that violence occurring in an area under the Licensee's control, during or shortly after Licensee's hours of operation, involving Licensee's members who had been drinking inside Licensee's establishment, is not causally linked to the operation of Licensee's business." *St. Nicholas,* 41 A.3d at 960. The Board contends that Licensee knew or should have known of a pattern of criminal activity occurring on its very doorstep and this is the proper standard for culpability that the trial court should have applied.

■ As stated, Section 470(a.1)(4) of the Liquor Code provides that renewal of a liquor license may be refused "due to the manner in which" the licensee operated the licensed premises. 47 P.S. § 4–470(a.1)(4). This is the standard employed by the trial court in finding "the record does not support a finding that the manner in which [Licensee] was operated contributed to and/or caused" the serious incidents of violence or the drug-related activity. (Trial Ct. Op. at 11, 18.) Accordingly, the trial court applied the proper standard as set forth in the Liquor Code.

The Board frames its argument based on an error of law, which is that the trial court erred by applying an incorrect standard of culpability. However, by arguing that Licensee knew or should have known of a pattern of criminal activity occurring on or about the licensed premises, the Board appears to be challenging the trial court's conclusion, based upon the factual findings, that there was no causal connection between the incidents and the manner in which the establishment was operated. The trial court heard this matter *de novo* in accordance with Section 464 of the Liquor Code and, while the trial court adopted the majority of the Board's findings of fact, the trial court reached its own conclusions based upon those findings. This was well within the province of the trial court. *See I.B.P.O.E. of West Mount Vernon Lodge 151 v. Pennsylvania Liquor Control Board,* 969 A.2d 642, 647–48 (Pa. Cmwlth.2009) (holding that, pursuant to Section 464, the trial court may reach its own conclusions based upon the findings "even when the evidence it hears is substantially the same as the evidence presented to the Board").

■ In *St. Nicholas* the trial court also conducted a *de novo* review, adopted the Board's findings, issued its own findings and conclusions of law, and affirmed the Board's decision denying the liquor license renewal. However, because the trial court here reached a different conclusion than the trial court in *St. Nicholas* does not

render the result in this matter erroneous. Pursuant to Section 464, a trial court may reverse a Board's decision to deny a license renewal "where its findings are supported by substantial evidence in the record as a whole." *I.B.P.O.E.*, 969 A.2d at 648. Here, the Board is not challenging the trial court's findings, only the trial court's conclusion; as such, the findings are conclusive on appeal.

Moreover, this case is factually different from *St. Nicholas*. In *St. Nicholas*, the licensee was a private club with approximately 2,000 club members. The licensee applied for renewal of its club liquor license, which the Board denied based upon the licensee's "citation history, a series of violent disturbances that occurred either inside the club or in the club's parking lot, and [l]icensee's failure to take substantial corrective measures to attempt to prevent future disturbances." *St. Nicholas*, 41 A.3d at 955. The eight disturbances considered by the Board included: (1) incidents of disorderly conduct and public drunkenness in the club's parking lot; (2) verbal and physical assaults or fights on or immediately adjacent to the licensed premises; and (3) a stabbing in the club's parking lot. *Id.* at 955–56. The local police responded to each disturbance and the captain of the police "stated that [l]icensee had become a drain on police resources." *Id.* at 955. After *de novo* review, "the trial court found that [l]icensee failed to maintain a security force sufficient to address the nature of incidents occurring at or near the club, which include[d] assaults, fights, and unruly members and guests." *Id.* at 957. On appeal to this Court the licensee argued, *inter alia*, that the incidents were wholly unconnected to the manner in which the licensee operated its business. We disagreed because the trial court found that "[a]ll eight incidents of disturbance occurred either inside the club or in its parking lot, and seven of the eight

involved one or more club members or their guests." *Id.* at 960. Therefore, we concluded that the trial court's opinion was supported by the evidence because it simply was "not plausible that violence occurring in an area under the [l]icensee's control, during or shortly after [l]icensee's hours of operation, involving [l]icensee's members who had been drinking inside [l]icensee's establishment, is not causally linked to the operation of [l]icensee's business." *Id.*

In this case, most of the incidents occurred outside the premises when the police were in the area for surveillance or other police matters and, although there is a parking area next to the licensed premises where illegal activity has been observed, it is not owned by Licensee. (Hr'g Tr., July 26, 2011, at 61, R.R. at 369a.) Also, most of the incidents here did not involve patrons of Licensee who had been drinking inside Licensee's establishment. The trial court found that the incidents occurring here resulted either "from a bad element residing within the housing projects" or "by prior incidents and/or bad blood between the parties involved." (Trial Ct. Op. at 11, 16.) The trial court also found that, prior to the incidents at issue here, the drug users and dealers remained on the streets even though they were well known to police and that Licensee did not condone or foster drug sales. Thus, the trial court's decision that there was not a causal connection between the incidents and the manner in which Licensee was operated, which is based on its findings, is not contrary to our opinion in *St. Nicholas*.

■ Next, the Board argues that the trial court abused its discretion and/or erred by finding that the remedial steps taken by Licensee were timely and substantial. The Board asserts that although there were remedial measures taken by

Licensee after the January 2010 meeting with the Nuisance Bar and Drug Task Force, including the hiring of security guards, the fact that numerous incidents occurred thereafter indicates that the steps taken were not substantial. The Board asserts further that the fact that the trial court found it necessary to order restricted hours of operation two years after the incidents occurred indicates that Licensee had failed to implement timely, substantial remedial measures.

A trial court may consider corrective or remedial measures taken by a licensee to determine whether those corrective measures warrant renewal of a liquor license. *Goodfellas, Inc. v. Pennsylvania Liquor Control Board,* 921 A.2d 559, 566 (Pa. Cmwlth.2007) (holding that the trial court is "free to consider the corrective measures" a licensee implements "in response to its citations, and to substitute its discretion for that of the Board in determining that those corrective measures warranted the renewal of [the] [l]icensee's license"). Here, the trial court found, based upon the credited testimony of Licensee's owner, Mr. Becker, that Licensee implemented the remedial measures after a January 2010 meeting with the Nuisance Bar and Drug Task Force; thus, the measures were timely. The trial court found, based on the credited testimony, that Licensee's remedial measures were affirmative, substantial and timely and also credited the testimony of Mr. Becker and Licensee's employees that, because certain residents moved away from the area, the problems have ceased.[5] The trial court also credited Mr. Becker's testimony that the use and sale of drugs was not condoned and that he called the police when he observed drug

transactions. Moreover, it does not appear that the trial court tacitly conceded that the affirmative steps taken (particularly the hiring of security guards) were not substantial because the trial court imposed restricted hours as a condition of the license renewal. A review of the trial court's reasoning on the imposition of the restricted hours as a condition of renewal shows that the trial court viewed the time period after 10:30 p.m. as particularly troublesome, as shown by the time in which the incidents occurred. The trial court opined that "[t]his is consistent with [L]icensee's hiring [of] security for Friday and Saturday nights from 10:00 p.m. until 2:00 a.m." (Trial Ct. Op. at 19.) The trial court's statements finding the remedial actions substantial are not inconsistent with its other statements or its reasoning regarding its requirement that Licensee close by 11 p.m. We, therefore, do not find any error with the trial court finding that the hiring of security guards was effective and their employment represented a substantial remedial measure.

Accordingly, the trial court did not err or abuse its discretion by finding that the remedial steps taken by Licensee were timely and substantial.

■ Finally, both the Board and Licensee argue that the trial court erred or abused its discretion in imposing a condition on the renewal of Licensee's license by restricting the hours of operation. For the reasons advanced by the Board, based upon the provisions of the Liquor Code, we conclude that the trial court erred.

The trial court draws its authority to review, *de novo,* a refusal by the Board to renew a liquor license from Section 464 of the Liquor Code. 47 P.S. § 4–464. There

---

5. While it is unclear from the testimony as to exactly when the alleged trouble makers moved, the fact that the Board presented no evidence of any incidents beyond November 2010 at the July 26, 2011 hearing buttresses Licensee's testimony that the problems have abated.

is no express authority in Section 464 that permits a trial court to impose a condition on a renewal of a liquor license. Section 464 only authorizes a trial court to "either sustain or over-rule the action of the board and either order or deny the issuance of a new license or the renewal or transfer of the license . . . to the applicant." *Id.* In addition, Section 470 of the Liquor Code [6] specifically authorizes the Board to enter into an agreement with an applicant for renewal of a license concerning additional restrictions on the renewal and further provides that a citation may be issued pursuant to Section 471 of the Liquor Code [7] if the applicant violates the agreement. More importantly, effective enforcement of any condition imposed by a trial court upon a license renewal may be impaired considering that the enforcement powers bestowed upon the Pennsylvania State Police, Bureau of Liquor Control Enforcement, to enforce the Liquor Code are provided for by statute, not via court order. *See* Section 211 of the Liquor Code,[8] 47 P.S. § 2–211 (providing for the creation of the Bureau of Liquor Control Enforcement within the Pennsylvania State Police for enforcing the Liquor Code and any regulations promulgated thereto). Accordingly, the trial court erred by conditioning the license renewal upon Licensee restricting its hours of operation.

For the foregoing reasons, we affirm the trial court's Order granting the renewal of Licensee's restaurant liquor license, but reverse the imposition of the condition that Licensee cease serving alcohol by 10:30 p.m. and close by 11:00 p.m. every night.

### ORDER

NOW, June 7, 2013, the Order of the Court of Common Pleas of Allegheny County entered in the above-captioned matters is hereby AFFIRMED, in part, and REVERSED, in part, in accordance with the foregoing opinion.

---

6. 47 P.S. § 4–470. Section 470 provides, in pertinent part, that when a licensee files an application for renewal:
> The board may enter into an agreement with the applicant concerning additional restrictions on the license in question. If the board and the applicant enter into such an agreement, such agreement shall be binding on the applicant. Failure by the applicant to adhere to the agreement will be sufficient cause to form the basis for a citation under section 471 and for the non-renewal of the license under this section.

Id.

7. 47 P.S. § 4–471. Section 471 governs the revocation and suspension of liquor licenses and the imposition of fines for any violation of the Liquor Code or the laws of the Commonwealth relating to liquor or other alcoholic beverages. Id.

8. Section 211 was added by Section 14 of the Act of June 29, 1987, P.L. 32 *as amended.*