**BCLT, INC.**

v.

**PENNSYLVANIA LIQUOR CONTROL
BOARD, Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 14, 2015.
Decided May 11, 2015.
Publication Ordered July 2, 2015.

Michael J. Plank, Assistant Counsel, Harrisburg, for appellant.

Charles L. Caputo, Pittsburgh, for appellee.

BEFORE: RENÉE COHN JUBELIRER, Judge, and MARY HANNAH LEAVITT, Judge, and P. KEVIN BROBSON, Judge.

OPINION by Judge P. KEVIN BROBSON.

The Pennsylvania Liquor Control Board (Board) appeals from an order of the Court of Common Pleas of Allegheny County (trial court), which reversed an order of the Board denying BCLT, Inc.'s (Licensee) application for renewal of its Restaurant Liquor License (liquor license). We now affirm.

On March 8, 2013, Licensee filed a timely application to renew its liquor license for the premises located at 1400 Fifth Avenue, Pittsburgh, Pennsylvania. (Reproduced Record (R.R.) at 195a.) In response to Licensee's application, the Board's Bureau of Licensing (Bureau) indicated that there were two violations of the Pennsylvania Liquor Code (Code)[1] and fourteen "incidents of disturbances" at or adjacent to Licensee's licensed premises which may warrant non-renewal of Licensee's liquor license. (Id. at 198a.) The Bureau ordered a hearing to determine whether to renew Licensee's liquor license.

On August 7, 2013, a hearing examiner conducted a hearing. (Id. at 1a.) The Board presented evidence concerning Li-

---

1. Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1–101 to 10–1001.

censee's two citations for violations of the Code. The first citation was issued on December 12, 2006. (*Id.* at 201a.) Licensee was charged with violating Section 493(12) of the Code[2] for failing to maintain complete and truthful records. (*Id.*) The charge was sustained, and Licensee was fined $300.00 for this violation. (*Id.* at 202a.) The second citation was issued on August 15, 2008. (*Id.* at 204a.) Licensee was charged with violating Section 406(a)(2)[3] of the Code and Section 493(16) of the Code[4] for selling alcohol after 2:00 a.m. (*Id.*) The charge was sustained, and Licensee was fined $1,200.00 for this violation. (*Id.* at 206a.)

The Board presented the testimony of Lieutenant Victor Joseph, Jr. Lieutenant Joseph testified that on September 12, 2012, he responded to an incident that occurred at the corner of Fifth Avenue and Stevenson Street, where Licensee's business is located. (*Id.* at 10a.) A security guard employed by Licensee, Steven Rogers, indicated that a fight had broken out inside Licensee's business and that, as a result of the fight, an unruly patron was ejected from the premises. (*Id.* at 14a.) The patron later returned with a gun and began to shoot in the direction of Mr. Rogers. (*Id.*) Mr. Rogers claimed that, even though he was carrying a firearm, he did not return fire. (*Id.* at 15a–16a.) A surveillance video provided to the police by Licensee, however, appeared to show an arm coming from the door of Licensee's business and returning fire.[5] (*Id.*) Lieutenant Joseph later spoke to Mr. Rogers and discovered that he did not have a license to carry a concealed firearm. (*Id.* at 18a.) Mr. Rogers also claimed to be a constable, but later admitted that he was not. (*Id.* at 16a–17a.) Lieutenant Joseph

testified that Mr. Rogers was later charged for carrying a firearm without a license and impersonating a public servant. (*Id.* at 18a.) On cross-examination, Lieutenant Joseph indicated that if there was "a call for the corner of Fifth [Avenue] and Stevens[on Street], somebody may use [Licensee's premises] as a landmark," even if a crime was not committed at Licensee's business. (*Id.* at 24a–25a.) He further testified that Kevin Cushin, the son of Licensee's owner, was cooperative during the investigation. (*Id.* at 25a.)

Lieutenant Joseph also testified about an incident that occurred on October 3, 2012. (*Id.* at 33a.) A bar patron exited Licensee's business with a severe knife wound on his face. (*Id.* at 36a.) Although there was a metal detector at Licensee's premises, the security guard that evening chose to pat patrons down instead. (*Id.* at 35a.) Although there was video surveillance on Licensee's premises, Lieutenant Joseph did not know if the tape from that evening had been recovered. (*Id.* at 38a.) On cross-examination, Lieutenant Joseph testified that the fight between the patron and the attacker had begun at a different location. (*Id.* at 41a.) The knife incident was a continuation of that fight. (*Id.*) Lieutenant Joseph testified that if the patron and the attacker had met on the street instead of on Licensee's premises, there still would likely have been "some sort" of altercation. (*Id.* at 50a.)

Officer James Zigarella also testified on behalf of the Board. Officer Zigarella testified that on June 28, 2011, he was informed that an individual was selling narcotics outside of Licensee's premises. (*Id.* at 55a–56a.) Officer Zigarella arrived at

---

**2.** 47 P.S. § 4–493(12).

**3.** 47 P.S. § 4–406(a)(2).

**4.** 47 P.S. § 4–493(16).

**5.** This video was not included in the record.

the scene and observed the individual pacing back and forth a few feet from the front door of Licensee's business. (*Id.* at 56a.) He also observed patrons entering and leaving Licensee's business. (*Id.* at 57a.) Officer Zigarella approached the suspect and saw a plastic bag in the suspect's hand. (*Id.* 58a.) He confiscated the bag, which contained suspected crack cocaine. (*Id.*) Officer Zigarella also found $428.00 in crumpled bills. (*Id.* at 63a.) The suspect was charged with possession with the intent to deliver. (*Id.* at 64a–65a.)

Sergeant Ryan Schmitt, testifying on behalf of the Board, described an incident that took place on June 1, 2011. Sergeant Smith testified that he responded to a call concerning an individual standing in front of Licensee's business with a firearm. (*Id.* at 72a.) When he arrived, the individual had already been placed in handcuffs. (*Id.* at 74a.) Sergeant Schmitt was informed that the suspect had been waving his firearm around inside Licensee's business. (*Id.* at 74a.) He testified that a surveillance video later confirmed that the incident had begun inside Licensee's business. (*Id.* at 77a.) The police report, however, indicated that the suspect was waving his gun outside Licensee's business. (*Id.* at 78a.) The suspect was charged with possession of a concealed firearm without a license and possession of a firearm by a former convict. (*Id.* at 76a.)

Officer Josh Robey also testified on behalf of the Board. On January 5, 2013, an individual approached Officer Robey and stated that he was involved in an altercation at Licensee's business. (*Id.* at 83a.) There was no physical evidence that the individual had been involved in an altercation and no witnesses stepped forward to testify to such an altercation. (*Id.*) Officer Robey could not recall if there was a video of the incident. (*Id.* at 84a.) A security guard employed by Licensee was unable to provide any information about the incident. (*Id.* at 84a–85a.) The police were unable to identify and charge a suspect. (*Id.* at 85a.)

Officer Mark Kall, testifying on behalf of the Board, explained that on January 28, 2012, he entered Licensee's premises to perform a "compliance check."[6] (*Id.* at 87a.) Another officer entered Licensee's men's room and found a plastic bag containing suspected cocaine hidden in a ceiling tile. (*Id.* at 90a.) Although Officer Kall did not personally recover the suspected narcotics, he was present when the bag was found. (*Id.* at 89a.) No tests were conducted to determine whether the substance was cocaine. (*Id.* at 93a.) Officer Kall testified that it "would be common practice for a narcotics dealer ... to hide the narcotics off their person in an accessible location so they can access it for sale." (*Id.* at 91a.)

Officer Terry Pryor also testified for the Board. Officer Pryor explained that on March 2, 2013, he responded to a call concerning a physical altercation that was occurring within Licensee's premises. (*Id.* at 100a.) When Officer Pryor arrived, five to six people were fighting just inside the double doors of Licensee's business. (*Id.*) Officer Pryor gave verbal orders for the group to stop fighting, but two individuals refused the officer's order. (*Id.* at 101a.) One of the individuals was nineteen years old and visibly intoxicated. (*Id.* at 103a, 106a.) Officer Pryor was forced to physically separate the two individuals. (*Id.* at 104a.) The two individuals were charged with disorderly conduct. (*Id.* at 107a.)

**6.** Officer Kall explained that compliance checks are performed to ensure that bars are complying with local ordinances and the Code. (R.R. at 87a.) They are performed at the direction of commanding officers or as part of a routine. (*Id.*)

Officer Pryor did not know if the underage individual was served an alcoholic drink at Licensee's premises. (*Id.* at 106a.)

Officer Matthew Malloy testified for the Board concerning a narcotics incident which occurred on September 1, 2011. Officer Malloy was patrolling Fifth Avenue when he saw an individual leave Licensee's premises. (*Id.* at 110a.) Officer Malloy noticed that the individual had a bulge in his pocket. (*Id.*) The officer approached the suspect, who admitted that he was carrying crack cocaine. (*Id.*) The suspect produced fifty-eight individually wrapped pieces of crack cocaine and was charged with possession of a controlled substance and possession with intent to deliver. (*Id.*) On cross-examination, Officer Malloy indicated that the investigation was not focused on Licensee's premises and that he did not know how long the suspect was inside Licensee's business before he left. (*Id.* at 115a.)

Detective Dwayne Schick also testified on behalf of the Board. As a detective with the narcotics unit, part of his job is to perform compliance checks during which his unit would search for illegal activity in licensed businesses. (*Id.* at 117a–18a.) On November 30, 2012, Detective Schick entered Licensee's premises to conduct such a check. (*Id.* at 118a.) Another detective found a plastic bag containing suspected crack cocaine on the floor. (*Id.* at 121a.) The substance in the plastic bag was not tested. (*Id.* at 122a.) Detective Schick did not know if anyone advised an owner or employee of Licensee that the narcotics were found. (*Id.* at 123a.)

Detective John McBurney, testifying on behalf of the Board, explained that he was also present during the November 30, 2012 compliance check. Detective McBurney testified that he is the coordinator of the Allegheny County Pittsburgh nuisance bar taskforce as well as a detective of the vice and narcotics units. (*Id.* at 126a.) His job is to oversee all of the police reports and complaints concerning "liquor-serving establishments." (*Id.* at 127a.) The Board introduced five police investigative reports pertaining to additional incidents not testified to by the officers and detectives above. Detective McBurney explained that the reports were related to incidents that occurred at Licensee's premises.[7] (*Id.* at 142a.) The reports were prepared by multiple officers. (*Id.*)

Kevin Cushin testified on behalf of Licensee. Kevin Cushin explained that he was directly involved in the day-to-day operations of Licensee's business. (*Id.* at 154a–55a.) He testified that Licensee's licensed premises used to stay open until 2:00 a.m. He noticed, however, that incidents were occurring around that time, so closing time was changed to 1:00 a.m. (*Id.* at 156a.) Additionally, a patron must be thirty years old to enter Licensee's business. (*Id.*) Kevin Cushin explained that the area around Licensee's premises was known for illegal activity, particularly drug activity. (*Id.* at 158a.) In response to this activity, Licensee installed six additional surveillance cameras inside and outside Licensee's business. (*Id.* at 159a.) Kevin Cushin stated that the police often ask him questions concerning the surrounding area, because they know he is cooperative. (*Id.*) Kevin Cushin also explained that although he initially did not require certain qualifications for security guards, in 2011, he began to require that all security guards be trained, state-licensed security officers. (*Id.* at 161a.) All patrons are

---

**7.** These incidents included three assaults, one drug incident, and one robbery. (R.R. at 210a–21a.)

patted down after 8:00 p.m. (*Id.* at 162a). Security guards are given extra compensation for arresting or detaining those engaging in illegal activity. (*Id.*) Kevin Cushin also indicated that Licensee now performs background checks on its security guards. (*Id.* at 166a.) The lighting on Licensee's premises has also been upgraded. (*Id.*) Although Licensee temporarily engaged the services of a police detail, the police later required it to hire at least two officers, which was not "feasible." (*Id.* at 169a–70a.) Licensee also maintains a list of patrons who are permanently barred from entering Licensee's business. (*Id.* at 174a.)

Kevin Cushin also testified about the slashing incident which occurred on October 3, 2012. He explained that the security guard was a trained police officer whom he trusted to run security at Licensee's business. (*Id.* at 164a.) Kevin Cushin stated that although the metal detector was not operating that night, the security guard used a wand to check female patrons and patted down male patrons. (*Id.* at 163a.) The metal detector "is just to scare people or deter them." (*Id.*) Kevin Cushin also testified about the incident involving Mr. Rogers. He stated that Licensee terminated Mr. Rogers' employment for falsely claiming to be a state constable. (*Id.* at 165a.) Kevin Cushin also testified that the patron who shot at Mr. Rogers had never entered Licensee's business. (*Id.* at 172a.) Kevin Cushin also discussed the compliance check which occurred on January 28, 2012. At the time of the inspection, there were no ceiling tiles on the men's room ceiling. (*Id.* at 173a.) Thus, it was not possible for the officers to have found narcotics concealed behind a ceiling tile. (*Id.* at 174a.)

On cross-examination, Kevin Cushin discussed the incident that occurred on March 2, 2013. He explained that the underage patron presented a false identification, which was rejected. (*Id.* at 184a.) The fight occurred after she was denied entry into Licensee's business. (*Id.* at 185a.) Kevin Cushin stated that Licensee terminates the employment of employees who do not enforce the age restriction. (*Id.* at 184a.)

Lastly, Benjamin Cushin, the owner of Licensee, testified. Benjamin Cushin testified that he was arrested on December 17, 2012, for disorderly conduct. (*Id.* at 188a.) The arrest stemmed from the presence of illegal gambling machines on Licensee's premises. (*Id.*) Although Benjamin Cushin was initially charged with a gambling offense in addition to disorderly conduct, the gambling offense was dropped. (*Id.* at 190a.) Benjamin Cushin stated that the gambling machines had been removed and would not be returned to Licensee's premises. (*Id.* at 189a.) He further testified that illegal activity regularly occurs in the area surrounding Licensee's premises. (*Id.*)

The Board refused to renew Licensee's liquor license, (*id.* at 223a), and issued an opinion denying Licensee's application for the renewal of its liquor license (*id.* at 225a–55a). In so doing, the Board noted that the fourteen incidents described above demonstrated a pattern of criminal conduct connected to Licensee's business and, thus, constituted an abuse of the licensing privilege. The Board further concluded that Licensee's attempts at remediation, particularly given Licensee's failure to turn on the metal detector, were inadequate to support renewal of Licensee's liquor license.

Licensee appealed to the trial court, which conducted a *de novo* hearing on February 11, 2014. The Board introduced into evidence its order, opinion, the transcript of the hearing before the examiner, and photographs depicting the location of

Licensee's premises. (*Id.* at 315a–22a.) Licensee presented additional testimony from Kevin Cushin and Benjamin Cushin.

Kevin Cushin explained that there are several homeless shelters in the area surrounding Licensee's premises, and he described the area in general as high in crime and drug activity. (*Id.* at 325a.) There are several other licensed establishments in the area. (*Id.* at 326a.) Kevin Cushin explained that Licensee's premises are inspected several times a year by the Bureau of Liquor Control Enforcement, the city police, and the Bureau of Building Inspections. (*Id.* at 329a–30a.) Licensee has never received a citation as a result of those inspections. (*Id.* at 330a.) Kevin Cushin's testimony concerning the remedial measures taken by Licensee was substantially the same as that presented during the Board hearing. Kevin Cushin did, however, state that Licensee had also banned solicitation and all large bags capable of holding a weapon. (*Id.* at 339a.) Benjamin Cushin testified that he was cited by the Bureau of Liquor Control Enforcement for having illegal gambling machines and that he paid a fine as a result of that citation. (*Id.* at 373a.) He further testified that he pled guilty to disorderly conduct, but he has not been cited for anything since. (*Id.*)

Following the hearing, the trial court reversed the Board's order, finding that much of the evidence pertaining to the incidents described above was inadequate and concluding that the incidents did not justify non-renewal of Licensee's liquor license. The trial court gave little weight to the Code violations due to the length of time between the occurrence of the violations and the Board's non-renewal of Licensee's liquor license. The trial court also excluded the five police investigative reports offered by the Board as hearsay. The Board appealed to this Court.

 On appeal,[8] the Board first argues that the trial court used the incorrect standard of culpability in concluding that the incidents did not justify non-renewal of Licensee's license. Specifically, the Board suggests that the trial court appeared to require a level of personal involvement in the incidents before the incidents could be found to justify non-renewal. The Board contends that it demonstrated a pattern of criminal activity that was causally related to Licensee's business and, thus, the trial court should have affirmed the Board's order. The Board further argues that the trial court erred in failing to address the timeliness and substantiality of Licensee's remedial measures.

 We first address the Board's argument that the trial court used the wrong standard of culpability in concluding that the incidents did not justify non-renewal of Licensee's license.[9] Section 470(a.1)(4) of

8. "Our review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law." *St. Nicholas Greek Catholic Russian Aid Soc'y v. Pa. Liquor Control Bd.*, 41 A.3d 953, 954 n. 1 (Pa.Cmwlth.2012).

9. The Board also appears to argue that the trial court improperly excluded the five police incident reports as hearsay. We agree with the trial court that these records are not admissible. "An individual may be a qualifying witness and his testimony may lay a proper foundation for the admission of a report if his responsibilities include the review of the report in question and he testifies that the report was prepared by a subordinate of his and maintained for him by a member of his staff." *First Ward Republican Club of Phila. v. Pa. Liquor Control Bd.*, 11 A.3d 38, 46 (Pa. Cmwlth.2010), *appeal denied*, 611 Pa. 647, 24 A.3d 864 (2011). Here, the Board presented the testimony of Detective McBurney in an attempt to authenticate the records. Detective McBurney testified only that he oversees

the Code [10] provides:

> (a.1) The Director of the Bureau of Licensing may object to and the [B]oard may refuse a properly filed license application:
>
> . . .
>
>> (4) due to the manner in which this or another licensed premises was operated while the licensee ... w[a]s involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in the areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

"A licensee is strictly liable for violations of the ... Code and the Board's regulations." *Philly Int'l Bar, Inc. v. Pa. Liquor Control Bd.*, 973 A.2d 1, 3 (Pa.Cmwlth. 2008). "A licensee may also, however, be held accountable for non-Liquor Code violations (like those under the Crimes Code), if it can be established that there was a pattern of illegal activity on the licensed premises about which the licensee knew or should have known, and the licensee failed to take substantial steps to prevent such activity." *Id.*

Here, the trial court correctly applied the standard set forth in Section 470(a.1)(4) of the Code. The trial court

found that the incidents were either not "chargeable" to Licensee's business, not "connected" to Licensee's business, not "attributable" to Licensee's business, not "tied" to Licensee's business, or insufficient to justify non-renewal of Licensee's liquor license. (Trial Ct. Op. at 6, 12–16.) The use of such language, although different from that of Section 470 of the Code, does not demonstrate that the trial court erroneously required a level of personal involvement to justify non-renewal of Licensee's liquor license. A reading of the trial court opinion as a whole demonstrates that the trial court did not attempt to determine whether Licensee was personally involved in the alleged illegal activity taking place in the area. Rather, the trial court first explained each incident and then determined whether the activity was connected to Licensee's business, or, in other words, due to the operation of Licensee's business. Thus, the trial court applied the correct standard in ordering the renewal of Licensee's liquor license.

▇▇▇▇ Throughout its argument concerning the correct standard of culpability to apply in determining whether to renew Licensee's liquor license, the Board also appears to argue that the trial court erred in concluding that the incidents were not causally related to Licensee's business. This Court has held that the trial court has the same level of discretion as the Board in liquor license renewal cases, and the trial court "may sustain, alter, modify or amend the Board's order even when it is based upon the same evidence presented before the Board." *Philly Int'l Bar, Inc.*, 973 A.2d at 3; *see also Paey Assocs., Inc. v. Pa. Liquor Control Bd.*, 78 A.3d 1187,

---

"the police reports that are taken by officers." (R.R. at 127a.) He did not testify that the reports were maintained for him by a member of his staff. Thus, the trial court did not err in excluding the reports as hearsay.

**10.** 47 P.S. § 4–470(a.1)(4), *added by* the Act of Dec. 21, 1998, P.L. 1202.

1199 (Pa.Cmwlth.2013), *appeal denied,* 624 Pa. 699, 87 A.3d 817 (2014). "[A] trial court may reverse a Board's decision to deny a license renewal 'where its findings are supported by substantial evidence in the record as a whole.'" *Becker's Café, Inc. v. Pa. Liquor Control Bd.,* 67 A.3d 885, 892 (Pa.Cmwlth.2013). Where the Board does not challenge the trial court's findings, but rather its conclusions, the findings become conclusive on appeal. *Id.* "[T]he trial court may ... reach its own conclusions based upon those findings even when the evidence it hears is substantially the same as the evidence presented to the Board." *I.B.P.O.E. of West Mount Vernon Lodge 151 v. Pa. Liquor Control Bd.,* 969 A.2d 642, 647–48 (Pa.Cmwlth.2009).

Here, the Board is essentially challenging the trial court's conclusion that the various incidents are not connected to the operation of Licensee's business. *See Becker's Café,* 67 A.3d at 981 (providing that causal connection between incident and manner in which establishment was operated is conclusion based upon factual findings). In so doing, the Board cites *St. Nicholas Greek Catholic Russian Aid Society v. Pennsylvania Liquor Control Board,* 41 A.3d 953 (Pa.Cmwlth.2012). In *St. Nicholas,* this Court affirmed a trial court order which affirmed a Board order denying a licensee's application for renewal based in part on eight incidents which took place within the licensee's private club or in licensee's parking lot. The licensee argued that the incidents were not causally connected to the manner in which the club was operated. This Court concluded: "It is simply not plausible that violence occurring in an area under the [l]icensee's control, during or shortly after

[the l]icensee's hours of operation, involving [l]icensee's members who had been drinking inside [the l]icensee's establishment, is not causally linked to the operation of [the l]icensee's business." *St. Nicholas,* 41 A.3d at 960. Thus, the Board contends that the incidents involved in the instant matter must be deemed to be causally connected to the manner in which Licensee's business is operated.

Here, the trial court simply weighed the evidence differently than did the Board. Although the trial court considered the evidence concerning each incident, it did not find all of the evidence persuasive. The trial court specifically noted that the evidence related to the gun incidents on September 12, 2012, and June 1, 2011, was inadequate. (Trial Ct. Op. at 12.) The trial court further concluded that the evidence concerning the drug incidents on January 28, 2012, and November 30, 2012, was unpersuasive because the substances recovered from the men's bathroom and the floor of Licensee's premises were not tested to determine whether they were, in fact, illegal substances. (*Id.* at 13–15.) Additionally, the evidence concerning the altercation on January 5, 2013, was inadequate, because there was no physical evidence nor were there any witnesses. (*Id.* at 14.) The drug incident on September 1, 2011, was similarly unpersuasive because the officer who arrested the drug dealer indicated that "'open-air' narcotic sales are common in th[e] area and there was nothing that focused on the [b]ar." (*Id.* at 13.) The evidence concerning the altercation on March 2, 2013, was unpersuasive because there was no proof that the underage individual became intoxicated inside Licensee's premises.[11] (*Id.* at 15.) Final-

**11.** The Board argues that the trial court's consideration of the connection between the underage individual's intoxication and the bar is in error because this Court "has affirmed non-renewal orders involving activity on or about licensed premises, with no evidence that persons involved were intoxicated, or that alcohol was involved." (Bd. Br. at 25 n.

ly, the incident involving Ben Cushin was unpersuasive, because, although he was initially charged with disorderly conduct and a gambling offense, the gambling charge was dismissed. (*Id.* at 17.) Thus, the trial court concluded that the incident was "not too severe" and the disorderly conduct charge alone did not warrant non-renewal. (*Id.* at 19.) The only incident that the trial court indicated could potentially be due to the manner in which Licensee's business was operated was the knife incident that occurred on October 3, 2012. Although the trial court noted that it may have been negligent for Licensee's security guard's failure to use the metal detector, it could not determine whether the incident would have occurred even if the metal detector had been used. The trial court concluded that "too many variables ex-ist[ed] for [it] to conclude that this incident . . . warrants non-renewal." (*Id.* at 18.) Thus, while there was adequate evidence in *St. Nicholas* for the trial court to conclude that the incidents were connected to the club, the trial court here found that substantial evidence did not exist.[12] Because the trial court's findings did not support a conclusion that the incidents were caused by the manner in which Licensee's business was operated, the trial court did not err in so concluding.[13]

Accordingly, we affirm the trial court's order.

---

6.) The trial court, however, did not cite this connection as a requirement to justify non-renewal. Rather, the trial court, as discussed above, was attempting to determine whether there was a connection between the incident and the manner in which the bar was operated.

**12.** While the circumstances surrounding this matter may have supported a different outcome, we find no error in the trial court's factual findings and exercise of discretion, and we are constrained to affirm the trial court's order.

*ORDER*

AND NOW, this 11th day of May, 2015, the order of the Allegheny County Court of Common Pleas is AFFIRMED.

---

**13.** The Board also argues that the trial court erred in failing to consider the remedial measures taken by Licensee. As noted above, Section 470(a.1)(4) of the Code provides that the Board may consider the steps taken to address the activity occurring on the premises. Here, the trial court concluded that no such activity was due to the operation of Licensee's business, thus, it was unnecessary to determine what steps Licensee took to address that activity and whether those steps were timely and substantial. The trial court, therefore, did not err in failing to consider the remedial measures taken by Licensee.