ST. NICHOLAS GREEK CATHOLIC
RUSSIAN AID SOCIETY,
Appellant

v.

PENNSYLVANIA LIQUOR
CONTROL BOARD.

Commonwealth Court of Pennsylvania.

Argued March 12, 2012.

Decided April 13, 2012.

Theodore J. Zeller, III, Allentown, for appellant.

Robin Coward, Plymouth Meeting, for appellee.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge (P.), and COLINS, Senior Judge.

OPINION BY Senior Judge COLINS.

■ This appeal involves an application for renewal of a club liquor license. The Pennsylvania Liquor Control Board (LCB) denied the renewal application of the St. Nicholas Greek Catholic Russian Aid Society (Licensee). Licensee appealed to the Lehigh County Court of Common Pleas (trial court), which affirmed the LCB's opinion. We affirm the trial court.[1]

### Background

Licensee is a private club located at 170–172 Allen Street, Allentown, Pennsylvania. It is commonly known as "Club Pachanga" on Saturday nights, when the club hosts large parties. Licensee filed a renewal application with the LCB for its Club Liquor License No. C–566 for the period beginning May 1, 2010, and ending April 30, 2012. The LCB's Bureau of Licensing (Bureau) objected to the renewal under Section 470 of the Liquor Code,[2] 47 P.S. § 4–470, based upon, *inter alia*, four adjudicated violations of the Liquor Code and 10 incidents of disturbance at, or immediately adjacent to, the licensed premises. A hearing was conducted on July 12, 2010. The hearing examiner recommended that the license be renewed, with several specific conditions for continued operation of the club. The LCB, however, based on its own review of the record from the administrative hearing, denied Licensee's renewal application on November 3, 2010. Licensee appealed to the trial court and the LCB then issued a 45–page opinion, with 126 findings of fact, on December 14, 2010 (LCB Opinion). The trial court conducted a *de novo* hearing on February 16, 2011, and affirmed the LCB on June

---

1. Our review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law. *In re License Renewal Application of Quippan Club,* 806 A.2d 491 (Pa.Cmwlth. 2002).

2. Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. §§ 1–101—10–1001.

21, 2011, adopting the LCB's findings of fact and also issuing its own Findings of Fact and Conclusions of Law (Trial Court Opinion). The instant appeal followed.

Licensee has approximately 2,000 club members. The licensed premises is a two-story building of approximately 13,000 square feet. The first story is the main dance floor and the second story is a private banquet hall. On Friday nights, the number of patrons generally ranges from 50 to 75, and on Saturday nights the range is from 200 to 300. Licensee operates in a "lower to lower middle class" neighborhood and there is a lot of crime in the area. (LCB Op. at 15, Findings of Fact (F.F.) ¶ 45; Sept. 25, 2008 Hearing Transcript (H.T.) at 22, Reproduced Record (R.R.) at 65a ("It's not the best neighborhood.").) Loitering is an issue around the premises. (LCB Op. at 16, F.F. ¶ 54.) The club has been vandalized with gang-related graffiti and its windows have been broken with rocks and gun shots. (LCB Op. at 16, F.F. ¶ 52.)

In denying Licensee's renewal application, the LCB cited Licensee's citation history, a series of violent disturbances that occurred either inside the club or in the club's parking lot, and Licensee's failure to take substantial corrective measures to attempt to prevent future disturbances. (LCB Op. at 34–35.) At the administrative hearing, the LCB presented evidence of the four adjudicated citations for violations of the Liquor Code from 1989 to 2006:

1) Citation No. 88–2462 for selling alcoholic beverages to non-members and operating a gambling device/permitting gambling on the premises in October 1988 (LCB Op. at 6, F.F. ¶ 6);

2) Citation No. 03–0852 for selling alcoholic beverages to non-members in May 2003 and failing to clean the "malt or brewed beverage dispensing system" at least once every seven days during the period January to April 2003 (LCB Op. at 6–7, F.F. ¶ 7);

3) Citation No. 05–1952 for issuing checks with insufficient funds in payment for purchases of malt or brewed beverages in June 2005 (LCB Op. at 7, F.F. ¶ 8); and

4. Citation No. 07–1366 for selling alcoholic beverages to non-members in November and December 2006 and January 2007. (LCB Op. at 7–8, F.F. ¶ 9.)

The LCB also presented evidence regarding eight incidents of disturbance,[3] which occurred between October 2008 and March 2010 inside the club or in the club's parking lot. Testifying at the hearing were, *inter alia,* Captain Stephen Mould of the Allentown Police Department (APD) and Licensee's chief security officer, Felipe Rosario. Although Mr. Rosario added certain details to Captain Mould's descriptions of the incidents, he did not dispute the basic facts of the incidents. In addition to testifying regarding the incidents, Captain Mould stated that Licensee had become a drain on police resources. (LCB Op. at 8, F.F. ¶ 13; July 10, 2010 H.T. at 7–8, R.R. at 494a–495a.) The incidents were:

1) *October 3, 2008.* APD responded to a report of a large group of people acting disorderly in Licensee's parking lot. APD arrived and the group dispersed. (LCB Op. at 38, F.F. ¶ 112.)

2) *November 1, 2008.* APD responded to an assault with injuries on the premises. A club member had been followed to Licensee's club from another night club. When the member

---

3. The record does not indicate why the Bureau cited 10 incidents in its objection letter, yet evidence of only eight was presented at the hearing.

exited Licensee's club and went to his car in Licensee's parking lot, the member was struck in the head with a hard object. (LCB Op. at 38, F.F. ¶ 113.)

3) *September 20, 2009.* APD responded to a fight between two male club members inside the club. Licensee banned both members. (LCB Op. at 38, F.F. ¶ 114.)

4) *September 20, 2009.* APD received a report that two female club members had a verbal altercation inside the club, which became a physical altercation outside the club. Licensee suspended the women's memberships. (LCB Op. at 38–39, F.F. ¶ 115.)

5) *October 17, 2009.* APD contacted Licensee to report a noise complaint. The music was turned down. (LCB Op. at 39, F.F. ¶ 116.)

6) *January 17, 2010.* APD responded to a fight in Licensee's parking lot between a member and a non-member. The member had been acting disorderly and was removed. As one APD officer was arresting the member, the non-member attacked the APD officer. Both individuals were arrested for public drunkenness and disorderly conduct. The member was banned. (LCB Op. at 39–40, F.F. ¶ 117.)

7) *January 17, 2010.* While responding to the first incident that night, APD encountered an unruly club member in the parking lot and arrested him for public drunkenness and disorderly conduct. (LCB Op. at 40, F.F. ¶ 118.)

8) *March 6, 2010.* APD responded to a report of a stabbing in Licensee's parking lot. The attackers, who were hanging around the parking lot, were non-members and the victim was a member's guest. (LCB Op. at 40, F.F. ¶ 119.)

The LCB found that citations for gambling devices, failing to clean coils, and issuing bad checks "appear to have been isolated incidents and do not establish that Licensee has abused the licensing privilege." (LCB Op. at 36.) On the other hand, the LCB found that repeated citations for selling alcohol to nonmembers were problematic and demonstrate "a pattern of disregard for the licensing privilege." (*Id.*) The LCB credited Licensee with the corrective measures implemented prior to the renewal proceedings in 2008. Those measures included using a card scanner to verify membership status at the door and implementing colored wristbands to distinguish between members and nonmembers once patrons are inside the club. (*Id.*) Based on these corrective measures, the LCB had previously granted renewal of the license for the period from May 1, 2008, to April 30, 2010, and ruled that the citations alone were not a sufficient basis for refusing to renew the license for the renewal period at issue, May 1, 2010, to April 30, 2012. Nevertheless, the LCB ruled that "the citations, combined with Licensee's serious incidents of disturbances at or immediately adjacent to the licensed premises, provide sufficient reasons for denying renewal of this license." (LCB Op. at 37.)

The LCB also found that Licensee's attempts at substantial corrective measures in response to the incidents of disturbance were inadequate. Licensee employs its own security force of nine uniformed security officers, three of whom are certified to carry firearms while on duty, including Mr. Rosario. (LCB Op. at 23, F.F. ¶¶ 91–95.) Licensee uses four security officers on Friday nights and nine on Saturday nights. (LCB Op. at 20, F.F. ¶ 73.) Licensee also contracts with the APD to hire

police officers for extra-duty work to patrol the parking lot on Friday and Saturday nights. (LCB Op. at 19, F.F. ¶ 70.) Licensee's security force conducts a pat-down search of all men, and a metal-detecting wand search of all men and women, entering the club. (LCB Op. at 21, F.F. ¶ 81.)

The LCB concluded that Licensee's corrective measures failed to adequately address the violence occurring inside the club and in the club's parking lot. In particular, the LCB noted that when APD officers were unavailable for weekend work, a problem of which Licensee's security chief was admittedly aware, Licensee's response was to simply use its own security force inside the club to periodically check the parking lot. (LCB Op. at 20–24, F.F. ¶¶ 76, 84, 100.) Thus, when Licensee's security team patrolled outside the club, Licensee was left with an inadequate security team inside. As a result, Mr. Rosario acknowledged that at one time Licensee no longer had anyone regularly monitoring the exterior of the club, including the parking lots. (LCB Op. at 24, 41, F.F. ¶ 100.)

The trial court adopted the findings of fact set forth in the LCB's December 14, 2010 opinion and made several additional findings. The trial court found that Licensee failed to maintain a security force sufficient to address the nature of incidents occurring at or near the club, which include assaults, fights, and unruly members and guests; that Licensee failed to implement an adequate contingency plan for those occasions when extra-duty police officers were not available; and that Licensee failed to maintain consistent communication with the APD. (Trial Ct. Op. at 1–2, F.F. ¶¶ 3, 5, 7.) The trial court found the testimony of Captain Mould to be credible, which includes his statement that Licensee was a drain on the police department's resources. (Id. at 1, F.F. ¶ 2; Feb. 16, 2011 H.T. at 84–89, R.R. 36a–37a.)

### Discussion

Licensee raises three issues on appeal to this Court. First, Licensee argues that the LCB and the trial court erred by finding that Licensee did not take substantial affirmative steps to guard against illegal activity happening at or near the club and by placing an impossibly high burden on Licensee to end crime in a bad neighborhood. Second, Licensee argues that the LCB and trial court erred by considering Licensee's past citations because they were all issued before the prior renewal period. Third, Licensee argues that the LCB and the trial court erred because there is no causal connection between the eight incidents of disturbance and Licensee's operation of its business.

Under the Liquor Code, renewal of a liquor license is not automatic. Section 470 of the Code provides that the LCB may, in its discretion, refuse to renew a liquor license for the following reasons:

(a.1) The Director of the Bureau of Licensing may object to and the board may refuse a properly filed license application:

(1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have violated any of the laws of this Commonwealth or any of the regulations of the board;

(2) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have one or more adjudicated citations under this or any other license issued by the board or were involved in a license whose renewal was objected to by the Bureau of Licensing under this section;

(3) if the licensed premises no longer meets the requirements of this act or the board's regulations; or

(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4–470.

■ Licensees are held strictly liable for violations of the Liquor Code that occur on the licensed premises. *Pennsylvania Liquor Control Board v. TLK, Inc.*, 518 Pa. 500, 544 A.2d 931 (1988). Licensees are also held accountable for activity occurring off-premises where there is a causal connection between the licensed premises and the activity. *Commonwealth v. Graver*, 461 Pa. 131, 334 A.2d 667 (1975). This Court upholds the LCB's exercise of discretion under Section 470 to find that even one past citation or violation is sufficient to support a decision refusing a renewal application. *Hyland Enterprises, Inc. v. Pennsylvania Liquor Control Board*, 158 Pa.Cmwlth. 283, 631 A.2d 789 (1993).

■ Here, the LCB's decision to deny renewal of the license is amply supported by the record and, therefore, is not an abuse of discretion. Licensee's citation history alone would have permitted the LCB to deny renewal. A history of three citations for selling alcohol to non-members is, as the LCB found, sufficient to establish "a pattern of disregard for the licensing privilege." (LCB Op. at 36.) Although the LCB explained that it would not have denied renewal based on the citations alone, its decision to deny renewal was supported by the history of incidents on club property. The eight incidents of disturbance occurred between October 2008 and March 2010 and included an assault with a weapon; three fights, one of which involved an attack on a police officer; and a stabbing. All of these serious incidents occurred on club property, either inside the club or in the club's parking lot.

Licensee's first argument on appeal can be boiled down to the following: Licensee cannot be expected to do everything possible to end crime in a crime-ridden neighborhood, where, as Licensee argues here, Licensee took substantial affirmative steps to prevent illegal activity from occurring. Licensee relies on our holding in *Rosing, Inc. v. Pennsylvania Liquor Control Board*, 690 A.2d 758, 762 (Pa.Cmwlth. 1997), *overruled on other grounds, Pennsylvania Liquor Control Board v. Richard E. Craft American Legion Home Corp.*, 553 Pa. 99, 103, 718 A.2d 276, 278 (1998), for the proposition that the trial court erroneously increased the burden on Licensee to prevent criminal activity in the area. In *Rosing*, the LCB had denied the renewal of a liquor license finding that the owners of the licensed business failed to take substantial steps to prevent illegal activity when, during a two-year period, they failed to contact police regarding criminal activity that they knew or should have known was occurring near their business. *Id.* at 759. On appeal the trial court reversed the LCB, finding that the

criminal activity at the licensed premises was due to the location of the premises in a high-crime area rather than the fault of the owners. This Court affirmed the trial court, holding that "*[t]he [o]wners are not required to do everything possible to prevent criminal activity on the premises,* act as their own police force, or close their business. They are only required to take substantial affirmative measures to prevent misconduct." *Id.* at 762–63 (emphasis added).

Licensee's reliance on *Rosing* is misplaced. Our holding in *Rosing* turned on the fact that the licensees did not know, and could not have known, about the criminal activity occurring near the licensed business, which was mostly possession of illegal drugs. *Id.* at 762. On the two occasions when the licensees suspected criminal activity was afoot, they contacted the police and cooperated with them. *Id.* This Court noted that there was no evidence in the record that the licensees had or should have had particularized suspicion of the illegal activity, especially given the clandestine nature of the drug-related activity. *Id.*

Unlike the circumstances in *Rosing,* here, the record supports the finding that Licensee was well-aware of the illegal activity. Moreover, unlike *Rosing,* illegal activity was occurring inside the club and in Licensee's own parking lot. Thus, contrary to Licensee's contention, the trial court did not require Licensee to end crime in the surrounding neighborhood. Rather, the LCB and the trial court expected Licensee to take substantial, affirmative steps to attempt to prevent misconduct on *Licensee's own premises.*

There is more than sufficient evidence in the record to support the finding that Licensee simply did not do enough. For example, the LCB credited Licensee for suspending or banning problematic members, hiring its own security force, and hiring extra-duty police officers on busy weekend nights. However, Licensee had been aware of violent incidents occurring in its parking lot since before the preceding renewal period (*i.e.,* prior to May 2008) and did not take further substantial remedial measures to abate those incidents. Given the testimony and the evidence of violence stemming from the club's operation, the LCB was correct to find that Licensee failed to take substantial corrective measures to resolve these incidents.

■ Licensee next argues that the trial court erroneously concluded that its past citation history warrants non-renewal of its license, because Licensee did not receive any citations during the preceding renewal period (*i.e.,* the period from May 1, 2008, to April 30, 2010) and Licensee had already taken effective, corrective steps to address the older citations. Licensee is correct that all four citations occurred before the club's license was renewed in 2008, and that the LCB had already considered those citations and the club's corrective measures when the LCB determined that the citations were not sufficient grounds to deny renewal in 2008. Licensee is incorrect that, as a result, the citations cannot form the basis of non-renewal now.

The Liquor Code and our cases are clear that the LCB has discretion in determining whether to grant or renew a liquor license. Case law also establishes that even a single past citation or Code violation is sufficient to support a decision refusing to renew a license. *See, e.g., Hyland Enterprises.* We have also ruled that in renewal proceedings, the LCB may consider a licensee's entire citation history to determine whether a pattern emerges and that the LCB may consider all past Liquor Code violations, no matter when they occurred. *I.B.P.O.E. of West Mount Vernon*

*Lodge 151 v. Pennsylvania Liquor Control Board,* 969 A.2d 642 (Pa.Cmwlth.2009); *Pennsylvania Liquor Control Board v. Bartosh,* 730 A.2d 1029 (Pa.Cmwlth.1999). Neither the Code nor our prior holdings place any *per se* temporal limitation on the LCB's review of a licensee's citation history, and Licensee cites no authority that supports its position. Further, and in any event, there is ample evidence in the record to support non-renewal in this case, even without the citations.

██ Third, Licensee argues that the record does not establish any causal connection between the alleged incidents of disturbance occurring near the club and the manner in which Licensee operates its business. Licensee argues that the incidents are "wholly unconnected" to its business operations due to the following facts: (a) the area surrounding the club is a high-crime area with significant gang- and drug-related activity; (b) other businesses in the immediate area surrounding the club have their own parking lots that are unfenced and unguarded and become late-night hang-out spots and centers for gang-related activity; and (c) the majority of the incidents of disturbance involved non-members.

The record does not support Licensee's view of the facts. All eight incidents of disturbance occurred either inside the club or in its parking lot, and seven of the eight involved one or more club members or their guests.[4] It is simply not plausible that violence occurring in an area under the Licensee's control, during or shortly after Licensee's hours of operation, involving Licensee's members who had been drinking inside Licensee's establishment, is not causally linked to the operation of Licensee's business.

██ Finally, as part of Licensee's third issue, Licensee argues that the trial court's conclusions regarding the incidents of disturbance are flawed because they are based only on oral testimony regarding the incidents, as the LCB failed to introduce into evidence the actual police reports. Licensee cites no case law to support its contention or to refute the basic rule that the LCB and the trial court are free to accept or reject the testimony of witnesses. *See, e.g., Pennsylvania State Police, Bureau of Liquor Control Enforcement v. Cantina Gloria's Lounge, Inc.,* 536 Pa. 254, 256, 639 A.2d 14, 19–20 (1994). Further, and in any event, Licensee's chief of security testified regarding the incidences of disturbance, confirming the basic facts of each one.

For the above reasons, we affirm the trial court. An appropriate order follows.

### ORDER

AND NOW, this 13th day of April, 2012, the order of the Lehigh County Court of Common Pleas in the above matter is **AFFIRMED.**

---

4. The record does not indicate whether the October 3, 2008 incident, involving a large, disorderly group in Licensee's parking lot, involved members, non-members, or both. What is clear, however, is that the group was drawn there because that night the club was hosting a private party for teens. (*See* July 12, 2010 H.T. at 44–45, R.R. at 531a–532a.)