# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greater Pittsburgh Social Club,       :
                 Appellant       :
                          :
          v.                :    No. 37 C.D. 2015
                          :    Submitted:  August 21, 2015
Pennsylvania Liquor Control Board    :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**             **FILED:  October 7, 2015**

The Greater Pittsburgh Social Club (Club) appeals from an order of the Court of Common Pleas of Allegheny County (trial court), which affirmed an order of the Pennsylvania Liquor Control Board (Board) denying the Club's application for renewal of its Club Catering Liquor License (liquor license).  We now affirm.

On March 25, 2013, the Club filed a timely application to renew its liquor license for the premises located at 6525 Hamilton Avenue, Pittsburgh, Pennsylvania.  (Reproduced Record (R.R.) at 143a.)  In response to the Club's application, the Board's Bureau of Licensing (Bureau) mailed an objection letter to the Club, explaining that a preliminary review of the Club's operating history indicated potential abuse of the licensing privilege that may warrant non-renewal of the Club's liquor license.  The Bureau later amended the objection letter, which provided:

It is alleged that you have abused your licensing privilege, and pursuant to Section 470 of the Liquor Code [(Code)[1]] (47 P.S. Section 4-470), you may no longer be eligible to hold a license based upon:

a) Violations of the . . . Code relative to Citation Numbers 13-0104 and 11-1077.

b) The improper conduct of your licensed establishment as there have been approximately nine (9) incidents of disturbances at or immediately adjacent to your licensed establishment during the time period June 2011 to present reported to the Pittsburgh Police Department. This activity includes but is not limited to assaults, fights, disorderly operations and a homicide.

(R.R. at 150a.) The Bureau ordered a hearing to determine whether to renew the Club's liquor license.

A hearing examiner conducted a hearing on July 30, 2013. (*Id.* at 1a.) The Board first presented evidence of the Club's citations for Code violations. The first citation concerned Section 437 of the Code,[2] which prohibits the operation of a licensed establishment without a valid health permit. (*Id.* at 152a.) An inspection revealed that the Club was operating for forty-nine days without a health permit, and the Club was fined $200.00. (*Id.* at 152a-54a.) The Club received a second citation on February 4, 2013, which charged the Club with violations of Sections 401(b) and 406(a)(1) of the Code,[3] pertaining to the service of alcohol to non-members of the Club, and Sections 406(a)(4) and 493(16) of the Code,[4] pertaining to the service of alcohol between 3:00 a.m. and 7:00 a.m. (*Id.* at

---

[1] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 4-470.

[2] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 4-437.

[3] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 4-401(b), 4-406(a)(1).

[4] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 4-406(a)(4), 4-493(16).

2

157a.) The Board found that on June 9, July 14, and September 8, 2012, a liquor enforcement officer entered the Club and purchased alcohol. (*Id.* at 157a-58a.) On November 17, 2012, a liquor enforcement officer was allowed to purchase alcohol at 3:20 a.m. (*Id.* at 158a.) The liquor enforcement officers were not members of the Club, and the Club had no catered events[5] scheduled on these dates. (*Id.*) The charges against the Club were sustained, and the Club was fined $1,750.00. (*Id.* at 159a.)

The Board presented the testimony of Officer Gregory Livesey, of the City of Pittsburgh Police Department. Officer Livesey testified that on May 6, 2012, he was dispatched to the Club in response to reports of gunshots. (*Id.* at 6a-7a.) When he arrived at the Club, he heard approximately five gunshots outside of the Club. (*Id.* at 7a.) The Pittsburgh City Police found the body of Dante Hawkins about 300 feet from the Club's premises. (*Id.* at 7a-8a.) Another victim, Asa Thompkins, was shot inside the Club. (*Id.* at 8a.) The Club's security was helpful in removing patrons from the Club and moving patrons to their cars. (*Id.* at 8a-9a.) On cross-examination, Officer Livesey testified that the shooter was never found. (*Id.* at 9a.) Zone 5, the area in which the Club is located, has a higher rate of gunshots fired than most of the other zones. (*Id.* at 11a.)

Asa Thompkins also testified about the shooting that occurred on May 6, 2012. Mr. Thompkins, who was not a member of the Club, entered the Club through a side door after paying $40.00 and walking through a metal detector.

---

[5] A licensed club may serve alcohol to non-members "who are using the facilities of the club by prior arrangement, made at least 24 hours in advance of the time for private meetings or functions, such as dances, card parties, banquets and the like; and which is paid for by the non[-]members." 40 Pa. Code § 5.83.

(*Id.* at 14a-15a, 17a.) He testified that he had been to the Club several times before. (*Id.* at 16a.) Inside the Club, Mr. Thompkins purchased a bottle of champagne. (*Id.*) As he was about to leave the Club, Mr. Thompkins was shot twice in the leg and once in the spinal cord, rendering him unable to walk. (*Id.* at 15a.) As Mr. Thompkins was lying on the ground in the Club, he overheard the owner of the Club suggesting that Mr. Thompkins should be taken outside of the Club. (*Id.* at 16a.) Mr. Thompkins was not moved, and he was eventually taken to the hospital. (*Id.*) Mr. Thompkins knew Dante Hawkins and had seen him inside the Club prior to the shooting. (*Id.* at 21a-22a.) He believed that Mr. Hawkins was nineteen or twenty years old. (*Id.* at 23a.) On cross-examination, Mr. Thompkins testified that he had argued with a male patron of the Club prior to the shooting, but he did not think that the argument caused the shooting. (*Id.* at 18a-19a.) Mr. Thompkins recalled that there was security both inside and outside of the Club. (*Id.* at 20a.)

The Board next presented the testimony of India Hamm. On March 17, 2012, Ms. Hamm entered the Club after paying $20.00 and passing through a metal detector. (*Id.* at 25a-26a.) Ms. Hamm's identification was also checked at the door.[6] (*Id.* at 25a.) Ms. Hamm was not a member of the Club, but she was permitted to purchase alcohol from the bar. (*Id.* at 25a-26a.) She explained that she had frequently visited the Club in the past. (*Id.* at 27a-28a.) While Ms. Hamm was dancing inside the Club, she was assaulted by Christina

---

[6] Ms. Hamm was born on April 9, 1991. (R.R. at 25a.) She was, therefore, twenty years old on March 17, 2012. She did not use false identification to gain entrance to the Club. (*Id.* at 28a.)

Floyd and a group of Ms. Floyd's friends. (*Id.* at 26a-27a.) Ms. Hamm sustained injuries to her right eye. (*Id.* at 27a.) Ms. Hamm and Ms. Floyd had verbal disagreements prior to the assault; however, they had never been involved in a physical altercation. (*Id.* at 31a-32a.) The Club's security separated Ms. Floyd from Ms. Hamm and escorted Ms. Hamm from the Club. (*Id.* at 34a.) After they left the Club, the Club's security turned Ms. Hamm over to the Pittsburgh City Police, who walked Ms. Hamm to her car. (*Id.* at 34a.)

Pittsburgh Police Detective Fred Wright testified on behalf of the Board. Detective Wright testified that on September 18, 2011, he was working an "approved detail" as an off-duty police officer at the Club. (*Id.* at 37a.) During his shift, Detective Wright observed Brandon Massie exit the Club and strike his girlfriend. (*Id.* at 38a.) Mr. Massie's girlfriend, Brenda Voss, was not in the Club, and it did not appear that Mr. Massie was intoxicated. (*Id.*) Detective Wright indicated that when he worked at the Club, there were usually three or four other officers working with him. (*Id.* at 41a.) The Club also employed trained, state-licensed security officers. (*Id.* at 44a.) Detective Wright explained that the security personnel visually check identification and send patrons through a metal detector before they can enter the Club. (*Id.* at 47a-48a, 56a.) If an individual does not clear the metal detector, the security personnel pats him or her down. (*Id.* at 48a-49a.) Detective Wright knew that the Club maintains a membership list, but he had not seen security personnel check the list "in a while." (*Id.* at 55a.)

Jerald Robinson, the Club's manager, and Angelo Weeden, the head of security for the Club, testified on behalf of the Club about the steps the Club has taken in response to the Code violations and the incidents of disturbances described above. Mr. Robinson testified that after being cited for failing to have a

5

valid health permit, the Club applied for a permit. (*Id.* at 63a.) In response to the second citation, involving the sale of alcohol to non-members after 3:00 a.m., the Club installed signs indicating that no drinks would be served after 2:55 a.m., installed neon clocks to ensure that the time was readily visible, and terminated the employment of the bartender who had served the drink. (*Id.* at 64a-65a.) Mr. Robinson explained that non-members are permitted to enter the Club during catered events. (*Id.* at 69a.) The Club hosts up to four catered events a week. (*Id.* at 71a.) In response to the shooting and at the request of the District Attorney, the Club stopped using one of its two entrances. (*Id.* at 76a.) Mr. Weeden testified that patrons go through three searches prior to entering the Club: patrons must empty their pockets and put the contents in a bin, step through a metal detector, and be patted down. (*Id.* at 82a.) Mr. Weeden explained that prior to the shooting, the security personnel in charge of searching patrons were "lackadaisical" in their searches. (*Id.* at 83a.) These employees were terminated. (*Id.* at 90a.) Identification is still checked visually without the use of an identification scanner. (*Id.* at 102a). The metal detector is now calibrated daily instead of "periodically." (*Id.* at 91a.) The Club keeps a list of barred patrons, but Mr. Weeden could not explain where the list was kept. (*Id.* at 96a, 104a.) There are thirty surveillance cameras, but the surveillance video is not monitored in real time. (*Id.* at 105a.) Rather, the Club's security personnel review the video at the end of the night. (*Id.*) Mr. Weeden explained that the security personnel check the membership cards of patrons seeking to enter the Club. (*Id.*)

The hearing examiner issued an opinion, recommending that the Club's liquor license be renewed subject to the following conditions:

> 4. [The Club] must immediately implement a policy of making certain all persons admitted to the [C]lub are

members of the [C]lub. Failure to abide by this provision should result in the revocation of the license.

5. All persons admitted to the [C]lub on any occasion must be members of the [C]lub. That is without regard to whether or not an event is catered.

6. [The Club] must immediately purchase and utilize an ID scanner upon all patrons who seek admission to the [C]lub.

7. [The Club] must complete RAMP[7] training, including all employees, within ninety (90) days of the renewal of the license.

8. [The Club] must at all times the club is open have an employee monitoring the thirty (30) surveillance cameras in real time. This person must be in a position to relay information to security personnel regarding issues both inside and outside the [C]lub.

(*Id.* at 218a-19a.) The Board, after reviewing the hearing record and recommendation of the hearing examiner, issued an opinion and order denying the Club's application to renew its liquor license. In so doing, the Board explained that the Club had received two citations for Code violations and there were three incidents of disturbances that occurred at the Club. The Club "failed to implement timely and substantial corrective measures to resolve the operational deficiencies that existed at the licensed premises." (*Id.* at 257a.) The Club appealed the Board's order to the trial court, which conducted a *de novo* hearing.

During the *de novo* hearing, the hearing record was admitted and the trial court heard the testimony of Mr. Robinson and Mr. Weeden. Mr. Robinson confirmed that patrons do not need to show membership cards to enter the Club during catered events. (*Id.* at 275a.) He could not recall if the Club had become

---

[7] "RAMP" is an acronym for "Responsible Alcohol Management Program."

7

RAMP certified. (*Id.* at 278a.) Mr. Weeden indicated that the Club had not purchased an identification scanner and that surveillance videos were reviewed "every week." (*Id.* at 290a, 295a.) The trial court issued an order affirming the Board. The trial court explained that the Club did not take timely and substantial measures to remedy the operational deficiencies of the Club. (Trial Ct. Op. at 8.) The Club appealed to this Court.

On appeal,[8] the Club argues that the trial court erred in considering evidence that should have been precluded and that the trial court erred in concluding that the Club did not take substantial remedial measures to remedy its operational deficiencies.

We first address the Club's argument that the trial court erred in considering improper evidence. Specifically, the Club contends that the trial court should not have considered evidence concerning the service of alcohol to non-members and minors, because the Board did not precisely identify these concerns in its objections to the renewal of the Club's liquor license.[9] *See Water*

---

[8] "Our review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law." *St. Nicholas Greek Catholic Russian Aid Soc'y v. Pa. Liquor Control Bd.*, 41 A.3d 953, 954 n.1 (Pa. Cmwlth. 2012).

[9] Within this argument, the Club also contends that the trial court erred in considering evidence concerning the Club's failure to utilize an identification scanner, failure to obtain RAMP certification, and failure to monitor the video feeds from its security cameras in real time. Specifically, the Club argues that there is no regulation that requires the Club to do these things. Although no regulation requires the Club to use an identification scanner, obtain RAMP certification, or monitor surveillance videos in real time, the evidence presented concerning these issues was relevant to the trial court's consideration of remedial measures taken by the Club. The Club's failure to implement these optional security measures supported the trial court's finding that the remedial measures taken by the Club were insufficient to remedy the Club's operational deficiencies.

8

*St. Beverage v. Pa. Liquor Control Bd.*, 84 A.3d 786 (Pa. Cmwlth.) (holding that objections not referencing specific section of Code were waived), *appeal denied*, 97 A.3d 746 (Pa. 2014). The Board counters that because the Club failed to raise this issue in its Concise Statement of Errors Complained of on Appeal, the issue has been waived.

When a party wishes to appeal an order of a trial court, the Pennsylvania Rules of Appellate procedure require that, upon the order of the trial court, an appellant must file a Concise Statement of Errors Complained of on Appeal. Pa. R.A.P. 1925(b). The appellant's statement must "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa. R.A.P. 1925(b)(4)(ii). Failure to do so results in the waiver of any issues not included in the statement. Pa. R.A.P. 1925(b)(4)(vii). The Club's Concise Statement of Errors Complained of on Appeal identifies the following errors:

> 1. The decision of the Trial Court to affirm the Board's nonrenewal of the liquor license was not based upon substantial evidence of record. The incidents of record in this matter do not constitute a pattern of illegal activity at the licensed premises, nor do any of them alone (or together) rise to the level of supporting the non-renewal of a liquor license. The Trial Court has provided no explanation for disregarding the substantial evidence of record.
>
> 2. The Trial Court erred in failing to consider the substantial remedial measures defense presented by [the Club]. The Trial Court has provided no explanation for disregarding these measures or as to why they were not substantial.

(R.R. at 323a.) Neither of the above errors reference deficient notice as a result of the Board's failure to reference a specific section of the Code. The Club has,

therefore, failed to identify the issue in its Concise Statement of Errors Complained of on Appeal, and, pursuant to Pa. R.A.P. 1925(b), the issue is waived.[10]

We next address the Club's argument that the trial court erred in concluding that the Club did not take substantial remedial measures to remedy its operational deficiencies.[11] In determining whether to renew a liquor license, the

---

[10] On June 8, 2015, the Club filed an application for leave to amend its statement of issues. By order dated June 24, 2015, we granted the Club's application, explaining that "it appears that [the Club] seeks to amend the statements set forth in its docketing statement." (Order of Judge Brobson, June 24, 2015). The Club submitted an amended docketing statement, which addressed the issue of deficient notice. The statement of issues in a docketing statement, however, is different from the Concise Statement of Errors Complained of on Appeal that is required by Pa. R.A.P. 1925(b). The statement of issues in the docketing statement is for the sole purpose of screening cases for this Court's Mediation Program. *See* Section 501 of the Internal Operating Procedures of the Commonwealth Court of Pennsylvania. The purpose of a 1925(b) statement, however, is "to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal," and, thus, facilitate appellate review. *Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998). To that end, "any amended or supplemental statement filed after the time provided in the [trial court's] order [requiring an appellant to file a 1925(b) statement] may not raise issues not contained in the original statement." *Tucker v. R.M. Tours*, 977 A.2d 1170, 1173 (Pa. 2009). Accordingly, the Club's amended statement of issues does not serve to amend its Concise Statement of Errors Complained of on Appeal.

Even if the Club had properly raised this issue in its Concise Statement of Errors Complained of on Appeal, we would reject the Club's argument. "[T]his Court has held that a party's full participation in a trial court's *de novo* hearing . . . will cure a prior notice deficiency." *Paey Assocs., Inc. v. Pa. Liquor Control Bd.*, 78 A.3d 1187, 1192 (Pa. Cmwlth. 2013), *appeal denied*, 87 A.3d 817 (Pa. 2014). Despite the Club's contentions that *Water Street Beverage v. Pa. Liquor Control Bd.*, 84 A.3d 786 (Pa. Cmwlth.), *appeal denied*, 97 A.3d 746 (Pa. 2014), is analogous to the instant matter, the parties in *Water Street Beverage* had no opportunity to participate in a *de novo* hearing. Here, the Club did have such an opportunity, which remedied the alleged notice deficiency.

[11] Within this argument, the Club appears to contend that substantial evidence does not support the existence of a causal connection between the Club's operation and the three incidents of disturbances. This matter, however, is analogous to *St. Nicholas*. In *St. Nicholas*, a licensee argued that eight incidents of disturbances, which occurred in a private club or in the private club's parking lot, were not causally connected to the manner in which the club was operated. **(Footnote continued on next page…)**

10

Board "may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises." Section 470(a.1)(4) of the Code.[12] A licensee is "not required to do everything possible to prevent criminal activity on the premises, act as their own police force, or close their business." *Rosing, Inc. v. Pa. Liquor Control Bd.*, 690 A.2d 758, 762-63 (Pa. Cmwlth. 1997), *overruled on other grounds*, *Pa. Liquor Control Bd. v. Richard E. Craft Am. Legion Home Corp.*, 718 A.2d 276 (Pa. 1998). Rather, a licensee is "only required to take substantial affirmative measures to prevent misconduct." *Id.* at 763.

In *St. Nicholas Greek Catholic Russian Aid Society v. Pennsylvania Liquor Control Board*, 41 A.3d 953 (Pa. Cmwlth. 2012), this Court affirmed a trial court order denying licensee St. Nicholas Greek Catholic Russian Aid Society's application to renew its liquor license. The licensee had received four citations for

———————————————

**(continued…)**

This Court concluded: "It is simply not plausible that violence occurring in an area under the [l]icensee's control, during or shortly after [the l]icensee's hours of operation, involving [l]icensee's members who had been drinking inside [the l]icensee's establishment, is not causally linked to the operation of [the l]icensee's business." *St. Nicholas*, 41 A.3d at 960. Here, two of the incidents occurred within the Club during its hours of operation and involved non-member patrons who had been drinking in the Club. The third incident, involving domestic violence, occurred directly outside of the Club's premises and involved a patron who had been drinking in the Club. This constitutes substantial evidence to support the existence of a causal connection between the Club's operation and the incidents of disturbances, and we, therefore, reject the Club's argument.

Additionally, the Club incorrectly asserts that the Club's citation history—two citations in five and a half years—did not support non-renewal of the Club's liquor license. It is well-settled, however, that "even a single past citation or Code violation is sufficient to support a decision refusing to renew a license." *St. Nicholas*, 41 A.3d at 959. We, therefore, reject the Club's argument that its citation history does not support non-renewal of its liquor license.

[12] 47 P.S. § 4-470(a.1)(4), added by the Act of Dec. 21, 1998, P.L. 1202.

11

Code violations, and eight violent incidents had occurred either within its premises or in a private parking lot that it owned. On appeal to this Court, the licensee argued that in response to the incidents it had banned the members involved in the violence, hired a security force, conducted pat-downs and metal-detecting wand searches of all patrons, and hired off-duty police officers to work during the weekend. The licensee contended that such measures constituted substantial remedial measures which warranted the renewal of its license. We rejected the licensee's argument and explained that there was "more than sufficient evidence in the record to support the finding that [the l]icensee *simply did not do enough*." *St. Nicholas*, 41 A.3d at 959 (emphasis added). We explained that the "[l]icensee had been aware of violent incidents occurring in its parking lot . . . and did not take further substantial remedial measures to abate those incidents." *Id.*

Here, there is sufficient evidence to show that the Club, like the licensee in *St. Nicholas*, did not do enough to remedy its operational deficiencies. Specifically, the trial court explained that the Club had problems with violence as well as the admission of underage and non-member patrons to the Club. Certain measures, such as age verification and metal detection, had been in place prior to the incidents of disturbances and the Code violations. After the Code violations and incidents of disturbances, the Club knew that underage patrons were drinking alcohol on its premises, but it did not purchase and utilize an identification scanner, which would have verified the age of patrons, confirmed the validity of an identification card, and alerted the Club's security personnel if a patron attempting to enter the Club had an outstanding warrant. (R.R. at 300a-04a.) Further, although patrons are now being patted down prior to being sent through the metal detector, the number of security personnel has not increased and the Club does not

12

have employees monitoring the surveillance videos in real time. (*Id.* at 288a-93a, 295a.) Lastly, despite the Club's knowledge that non-member patrons were entering its establishment, the Club's security personnel have not referenced a membership list to verify the names of members "in a while." (*Id.* at 55.) As the trial court noted, there was no testimony concerning the procedures for catered events, which are open to non-members nearly every weekend. (*Id.* at 275a.) Further, records of the catered events were not presented. We, therefore, reject the Club's argument that the trial court erred in concluding that the Club did not take substantial remedial measures to remedy its operational deficiencies.[13]

Accordingly, we affirm the trial court's order.

_____
P. KEVIN BROBSON, Judge

---

[13] The Club also appears to argue that its remedial measures were timely. Because we agree with the trial court that the Club did not take substantial remedial measures to abate the misconduct occurring on its premises, we need not address this argument. *See Becker's Cafe, Inc. v. Pa. Liquor Control Bd.*, 67 A.3d 885, 893 (providing that remedial measures must be both substantial and timely).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greater Pittsburgh Social Club,   :
        Appellant  :
            :
    v.        :  No. 37 C.D. 2015
            :
Pennsylvania Liquor Control Board :

## O R D E R

AND NOW, this 7th day of October, 2015, the order of the Court of Common Pleas of Allegheny County is hereby AFFIRMED.

_____
P. KEVIN BROBSON, Judge